**HONG KONG EXPORT CREDIT INSURANCE CORP., Plaintiff,**

v.

**DUN & BRADSTREET, Defendant.**

**No. 72 Civil 3257.**

United States District Court,
S. D. New York.

Dec. 29, 1975.

Smith, Steibel, Alexander & Saskor, New York City, for plaintiff; Ludwig Saskor, George L. Selden, New York City, of counsel.

White & Case, New York City, for defendant; John J. McAvoy, Sharon E. Grubin, New York City, of counsel.

LEVET, District Judge.

The defendant here has moved pursuant to Rule 50(a) of the Federal Rules of Civil Procedure for a directed verdict of dismissal as to all five of plaintiff's claims:

One, as to the breach of the subscription agreement; two, as to the so-called breach of the cabling agreement; three, negligence; four, gross negligence and five, fraud.

■ Under Rule 50(a) such a motion will be granted only where there is an absence of controverted issues of fact. In *Brady v. Southern Railroad,* 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943), the Supreme Court announced the standard in the following terms:

"When the evidence is such that without weighing the credibility of witnesses there can be but one reasonable conclusion as to the verdict, the Court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims."

First, I consider the so-called subscription contract; that is, for a breach of the so-called subscription contract.

Plaintiff alleged that defendant breached this agreement by its failure to timely mail the special notice of July 22, 1970 which described the $585 suit and attachment against Belcrest. As proof of defendant's failure to timely mail this report, plaintiff offered evidence that the report was not received by it until November 1970. This evidence was in the form of plaintiff's date stamp on the report and testimony that it was plaintiff's business practice to date stamp all incoming mail as it was received.

■ The Court is of the opinion that plaintiff has met its initial burden of proof of failure to mail and has thereby shifted to

defendant the burden of going forth with the evidence of proof of mailing. If defendant offers, as counsel has indicated, no direct evidence of mailing then the question as to when the report was mailed remains for the jury to determine. Whether any such failure to timely mail constitutes a breach of the contract by reason of its amounting to gross negligence, as I shall later instruct you, is also a question of fact for the jury's determination.

Therefore, the Court denies defendant's motion for dismissal of plaintiff's claim of breach of the written subscription agreement.

Secondly, the so-called cabling agreement.

In the instant case, plaintiff alleges that an oral contract was entered into with defendant to supply plaintiff with information by cable. This has become known as the "cabling agreement."

Plaintiff contends that proof of the existence of this oral contract and its terms has been proved by the testimony of Mr. Hill and by several memoranda and letters offered into evidence.

Mr. Hill testified that he had carried on discussions with the defendant, in person, to provide a means of cabling adverse information to plaintiff. This first meeting, according to Hill, took place in the middle of 1969 (See page 113 of the transcript).

Messrs. Kane, Hight and Duncan were present at this meeting on behalf of the defendant. However, the major part of this meeting consisted of a discussion between Mr. Kane and Mr. Hill. Mr. Hill prepared a memorandum of his meeting with Kane (Exhibit 7).

Quoting from that document, Mr. Hill wrote:

"I discussed a number of possibilities with them, including their cabling to us adverse information such as the filing of petitions under Chapters X and XI of the Bankruptcy Act."

This meeting between Hill and Kane was followed up by an exchange of correspondence between the parties. These are contained in Exhibit 8. The first letter, dated May 29, 1969, was from Mr. Kane to Mr. Hill and it states:

"We are studying the possibility of transmitting bankruptcy information by cable."

A response to this letter, dated September 26, 1969, was sent by Hill to Kane. It states:

"I wonder whether you have reached any conclusions about the possibility of transmitting bankruptcy information to us by cable."

The last letter in this series, dated October 16, 1969 (Exhibit 8), was sent by Kane to Hill. It states:

"Regarding the transmission of bankruptcy information to you by cable, we plan to experiment with this through one of our international service consultants."

Another in-person meeting was held between the defendant and Mr. Hill. This time defendant was represented by Mr. Adamson, president of Dun & Bradstreet International. Hill prepared a memorandum of this meeting (Exhibit 9). Paragraph (e) of that memorandum stated:

"He noted that we were in the process of trying to establish with D & B New York a system under which adverse information on buyers on whom we have requested reports within the last six months would be transmitted to us by cable."

In support of its contention that a cabling agreement was entered into, plaintiff offers the deposition testimony of Joseph Casal. Mr. Casal was the director of International Reporting and Service for defendant when his deposition was taken.

Although Mr. Casal believed that some arrangement had been made to cable information, he was unable to describe the terms of the agreement.

At this point some basic holdings with respect to contracts are relevant.

■ Although the parties may have had and manifested an intention to make a contract, if the content of their agreement is unduly uncertain and indefinite no contract would have been formed.

The promises and performances to be rendered by each party must be reasonably certain. This can only be accomplished when the contract is definite as to its material terms.

■ Williston has stated that the interpretation of a writing is for the Court. 4 Williston, § 616. Even where the contract is oral and when the exact words used by the parties are not in dispute, the Court will deal with the matter in the same way as if the contract were written. Where, however, the meaning of a writing is uncertain or ambiguous and extrinsic evidence is introduced in aid of its interpretation, the question of its meaning should be left to the jury except where the meaning is so clear that reasonable men could reach only one conclusion, in which event the Court should decide the issue as it does when the resolution of any question of fact is equally clear.

■ Viewing the evidence in its most favorable light to the plaintiff, the most that can be said is that there was an oral contract as to the cabling of bankruptcy information only. The words of the parties in their letters and in the memoranda of Hill are clear and unambiguous. There is no need for extrinsic evidence as to meaning in the trade to clarify the language in these writings.

Consequently, there is only one meaning that reasonable men could reach as to the terms of this agreement. Comparing an attachment with a bankruptcy is somewhat like drawing an analogy between apples and oranges. There is nothing in the proof which shows that the defendant agreed to cable to plaintiff that type of information which was contained in the July 22, 1970 special report on Belcrest. There is no evidence that this type of information that is, an attachment, was even discussed by the parties when they were considering some type of cabling arrangement.

■ Assuming that there is an oral contract, which, of course, is debatable, its terms will be construed by the language used by the parties. This court shall not permit secondary meanings to vary the terms of a clear instrument.

As a result, I find that there is no question of fact as to the terms of the alleged cabling agreement. If such an agreement were found, the most that could be said is that it required the supplying of bankruptcy information only. It is for this reason that I dismiss the plaintiff's cause of action for breach of the cabling agreement and I direct dismissal of all other causes of action associated with the said cabling agreement.

Now I come to negligence and gross negligence as to subscription agreement.

The defendant moves for a directed verdict of dismissal as to the claims of negligence and gross negligence pertaining to the subscription agreement.

The subscription agreement contained a clause commonly known as an exculpatory clause. The existence of this clause is admitted by the plaintiff. In essence, this clause provides that the defendant does not guaranty the correctness of information furnished to its subscribers, and that the defendant is not liable for loss or injury caused by its negligence in procuring, compiling, collecting, interpreting, communicating or delivering information.

The plaintiff claims that the exculpatory clause is inapplicable as a defense to its claims. Its position is based on two theories. First, plaintiff claims that it was not on an equal bargaining position with the defendant when it entered into the subscription agreement in October, 1966.

Secondly, the plaintiff claims that the exculpatory clause was not intended to encompass a "failure to perform", in that defendant failed to mail the special report on Belcrest until November, 1970.

■ An exculpatory clause in a contract is intended to insulate one of the parties from liability resulting from his own negligence or other conduct. Whether or not such provisions when properly expressed will be given effect depends upon the legal relationship between the parties and the interest of the public therein.

Where there is no special legal relationship and no overriding public interest, and

the contract has been entered into voluntarily by competent parties, the contract is valid and enforceable. The citation is *Ciofalo v. V. Tanney,* 10 N.Y.2d 294, 220 N.Y.S.2d 962, 177 N.E.2d 925.

In the instant case, there is no showing of unequal bargaining strength between the parties nor is there a showing that the subscription agreement was a contract of adhesion. Both plaintiff and defendant are corporations. Adhesion contracts usually affect essential commodities and services. In these cases, public policy requires that members of the public be protected. Here the parties contracted at arm's length.

There is no showing that the plaintiff would have been rendered helpless by its failure to accept the terms of the subscription agreement.

As to plaintiff's second theory, I find that failure of the defendant to mail the special notice of July 1970 does not constitute non-performance of the contract. The cases which plaintiff has offered on this point are distinguishable from the case at bar. The contract in the instant case did not call for the defendant to transmit one particular piece of information to plaintiff. The defendant's obligation under the contract provided for it to supply numbers of service items to the plaintiff. Such service called for the defendant to supply numerous reports to the plaintiff. Consequently, a failure to send one report, if proven, would not constitute a total non-performance of the subscription agreement.

A contract is to be construed in the light of the surrounding circumstances and the situation of the parties at the time of its making. The court will construe the words of the contract in accordance with their usual, common and ordinary meaning. A reasonable meaning will be given to all the provisions of a contract. The words, "defendant is not liable for loss or injury caused by its negligence in * * * communicating or delivering information" are reasonable and clear. Such words, I find, were meant to encompass a situation where the defendant failed to mail one report, out

of many, in a prompt and reasonable manner.

Thus, as to the subscription agreement, the motion for a directed verdict to dismiss the claim of negligence—I repeat, this is as to the subscription agreement—is granted. However, as to the claim of gross negligence, the motion for a directed verdict to dismiss is denied.

Now I come to the count or claim of fraud.

The law in New York as to fraud is clear and goes back to the landmark decision in *Ochs v. Woods,* 221 N.Y. 335, 117 N.E. 305 (1917), which has been affirmed by countless court decisions. Plaintiff must prove by a fair preponderance of the credible evidence the essential elements of an action for fraud. These are:

(1) "Representation," the representation of a material fact;

(2) "Falsity," that such representation was false;

(3) "Scienter," that the defendant had knowledge that such representation was false;

(4) "Deception," that plaintiff relied upon such false representation; and

(5) "Injury," that plaintiff relied to his detriment and was injured by defendant's false representation. Id., 221 N.Y. at 338.

As to the element of representation, any non-disclosure, as herein alleged by plaintiff, is not in itself a representation. However, partial disclosure may constitute representation of undisclosed facts and in this case, since plaintiff has received a number of credit reports on Belcrest from defendant, the failure of defendant to forward the July 22, 1970 special notice may constitute such a representation of undisclosed facts.

"Scienter" refers to the intent to deceive. Such intent to deceive can be inferred from knowledge of false representation, that is, in this instance, knowledge by defendant that it failed to forward the special notice of July 22, 1970. Intent to de-

ceive can also be inferred by reckless conduct of the defendant in giving the pretense that it had mailed all current reports on Belcrest to plaintiff when, in fact, defendant knew or should have known it had not done so.

 It is the opinion of the court that plaintiff has failed to prove the element of scienter, that is, the intent to deceive. To permit the charge of fraud to go to the jury requires that plaintiff must have proved each and all of the aforesaid elements by a fair preponderance of the credible evidence. The court is of the opinion that this has not been done and, therefore, this cause of action, that is, the one for fraud, must be and is dismissed.

In conclusion:

(1) The motion to dismiss the claim based upon the so-called "cabling agreement" is granted. Consequently, all causes of action associated with the cabling agreement are dismissed.

(2) The motion for a directed verdict to dismiss the claim of fraud is likewise granted.

(3) The motion for a directed verdict of dismissal as to the claim of gross negligence as it applies to plaintiff's claim under the subscription agreement is denied.

(4) The motion for a directed verdict of dismissal of the negligence claim based upon the subscription agreement is granted. I say negligence, not gross negligence.

(5) The motion for a directed verdict of dismissal of the claim for breach of the subscription agreement is denied as indicated heretofore.

OPINION RENDERED AT THE CLOSE OF ALL THE EVIDENCE GRANTING DEFENDANT'S MOTION FOR A DIRECTED VERDICT OF DISMISSAL AS TO PLAINTIFF'S REMAINING CLAIMS OF GROSS NEGLIGENCE AND BREACH OF THE SUBSCRIPTION AGREEMENT

THE COURT: The plaintiff here has moved for a directed verdict in favor of the plaintiff as against the defendant.

The defendant, in turn, has moved for a directed verdict of dismissal as to the remaining causes of action on the ground that the plaintiff has failed to establish gross negligence on the part of the defendant.

Neither motion was entirely unexpected to this court.

It is plaintiff's contention that any failure to mail, if found, would constitute gross negligence as a matter of law. Plaintiff cites *Mowry against Western Union Telegraph Company,* 51 Hun. 126, 4 N.Y.S. 666 [1889], in which the Court found that the failure of Western Union to send a certain telegram was sufficient to sustain a finding of gross negligence.

 However, I find that the mere failure, if true, of the defendant to mail a notice of July 1970 doesn't constitute gross negligence.

The cases which plaintiff has offered on this point are distinguishable from the case at bar. The contract in the instant case didn't call for the defendant to transmit one particular piece of information to the plaintiff. The defendant's obligation under the contract provided for it to supply a continuous service to the plaintiff. Such service called for the defendant to supply numerous reports to the plaintiff. Consequently, a failure to send one report, even if proven, wouldn't constitute a total non-performance of the subscription agreement, nor would it constitute gross negligence.

When the parties contracted in October 1966, they entered into a certain subscription agreement, Exhibit 3. This agreement defined the basic relative rights and obligations of the parties. The subscription agreement has a clause which provides that the defendant doesn't guarantee the correctness of information furnished to its subscribers, and that the defendant is not liable for loss or injury caused by its negligence in procuring, compiling, collecting, interpreting, communicating or delivering information. This is what is known as an exculpatory clause, and defendant has pleaded this exculpatory clause as a defense.

When there is an exculpatory clause in a contract, as in this case, the defendant can't be held liable for what is called ordinary or simple negligence, but only for what is called gross negligence. Gross negligence means that the defendant has not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness.

I mentioned a few words about ordinary negligence or simple negligence. That is the doing of some act which a reasonably prudent person wouldn't do under all the circumstances of a given case. It is the failure to use ordinary and reasonable care under the given set of circumstances, or doing what a reasonably prudent person wouldn't do.

Ordinary care is that which reasonably prudent persons exercise in the management of their own affairs in order to avoid injury to themselves or to others.

If a defendant failed to use that degree of care which a reasonably prudent man in the business of the defendant would use under the circumstances, then the defendant would have committed simple negligence.

However, in this case, the plaintiff must show more than ordinary negligence. The plaintiff must prove by a fair preponderance of the credible evidence that the plaintiff's failure to mail a report on Belcrest, within a reasonable time after its issuance, was due to the defendant's gross negligence.

The defendant's motion for a directed verdict must be granted. Looking at the evidence in the light most favorable to the plaintiff, it can't be said that the plaintiff has proved that defendant's conduct was so reckless in nature as to constitute gross negligence, which, I repeat, implies great negligence and the want of even scant care. It has been defined as a disregard of the consequences which may ensue from the act and indifference to the rights of others.

Now, the burden of proof here was on the plaintiff to prove by a fair preponderance of the credible evidence that the defendant's conduct amounted to gross negligence.

In this instant case, the record is replete with testimony as to the mailing practices of the defendant. In my judgment, no reasonable man could say that the defendant was indifferent or reckless with regard to its procedures or practices as to the mailing of reports.

A motion has also been made by defendant to strike certain exhibits. In view of the determination I am here making, I don't think it is necessary for me to decide this motion.

Accordingly, here, the motion of defendant for a directed verdict is granted with cost, and the motion of the plaintiff for a directed verdict is denied.

The clerk is, therefore, directed to enter judgment for the defendant here together with costs in this action.