SHERKATE SAHAMI KHASS RAPOL
(RAPOL CONSTRUCTION
CO.), Plaintiff,

v.

HENRY R. JAHN & SON,
INC., Defendant.

HENRY R. JAHN & SON, INC., Defendant and Third-Party Plaintiff,

v.

LUFKIN INDUSTRIES, INC.,
Third-Party Defendant.

No. 76 Civ. 4919 (IBC).

United States District Court,
S. D. New York.

Feb. 4, 1982.

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for plaintiff; Caspar F. Ewig, New York City, of counsel.

Frederick H. Block, New York City, for defendant and third-party plaintiff.

Rogers, Hoge & Hills, New York City, for third-party defendant; Frank H. Gordon, James N. Blair, Ted G. Semaya, New York City, of counsel and on the brief.

## OPINION

IRVING BEN COOPER, District Judge.

### Introduction

Plaintiff Rapol Construction Corp. (Rapol), an Iranian corporation, brings this action against defendant Henry R. Jahn & Son, Inc. (Jahn), a New York corporation, under the New York Uniform Commercial Code and common law fraud provisions.[1] The gravamen of the complaint is that Jahn failed to ship the goods which Rapol ordered. For its part, Jahn denied any

wrongdoing and impleaded the manufacturer of the goods, Lufkin Industries, Inc. (Lufkin), a Texas corporation, on the ground that Lufkin "will be liable" to Jahn if the jury found Jahn liable in the main action. At the close of plaintiff's case, we directed judgment in defendant's favor and dismissed the complaint and third-party complaint as a matter of law.

### The Facts

For approximately thirty (30) years, Rapol has been in the business of constructing irrigation projects, roads and buildings in Iran.[2] Its president and general manager is Hassan Mortezai-Faird (Mortezai-Faird) at all times relevant to this action principally engaged in the financial and administrative aspects of the Rapol enterprise. He also held approximately 30% to 40% of its stock.[3] Another principle Rapol shareholder and a corporate director involved herein is Iraj Safapour (Safapour) a civil engineer primarily responsible for the technical function of Rapol's construction business.[4]

In 1973 or 1974 Rapol placed a bid on a construction project in Iran called the "Gotvand Irrigation Project" (project). In July, 1974 it was awarded one of the contracts for the project and another in December, 1974.[5]

The projects on which Rapol successfully bid involved substantial work. One contract, affecting an area of approximately 18,000 acres, called for the construction of bridges, roads and canals fitted with such features as electrically operated gates and automatic water level control equipment. Safapour testified that the related contract involved the same type of work, but called for canals of different size and included the construction of 130 houses for laborers. When construction of the projects was actually underway, Safapour was responsible

---

1. We bifurcated the issues of liability and damages for the jury; only liability was tried.

2. T.T. 3–4 ("T.T." refers to the trial transcript).

3. T.T. 4, 107, 170.

4. T.T. 3–5, 108. At present Rapol has three (3) shareholders: Mortezai-Faird, Safapour and a Mr. Keshaverzi. In 1975 there were three (3) unspecified shareholders in addition to Mortezai-Faird and Safapour. T.T. 4, 107–08.

5. T.T. 6, Plaintiff's Exhibit 1, p. V–1.

for overseeing the work of 1000 laborers and the operation of $10,000,000 worth of equipment.[6]

In preparing for construction work, Rapol had to purchase equipment. Along with canal digging machinery, concrete mixers and other pieces of equipment, Safapour and Mortezai-Faird decided upon dump trailers (in addition to those already available)[7] for the large amount of gravel and sand which had to be transported.

About January, 1975 Rapol requested and received information and brochures concerning the needed construction equipment from Amir Entezman (Entezman) of Iran Planing, an Iranian construction equipment broker and agent.[8] Iran Planing had acted as agent for Rapol on prior occasions. Safapour and Entezman had known each other since 1966.[9] Among the brochures received was one of the Lufkin model TD-27 dump trailer.[10]

Safapour testified that in 1975 he was familiar with dump trailers but had not personally worked with the type of trailer described in the Lufkin brochure.[11] He further testified that the TD-27 dump trailer differed from the dump trailers Rapol owned or operated: In the TD-27 model the box, containing material for transportation, and the chassis were one piece which rose together when the attached unit unloaded its cargo. When operating the dump trailers which Rapol had in 1975, the chassis would remain parallel to the ground and only the box rose (by means of a hydraulic lift) when the cargo was unloaded.[12]

Safapour undertook to determine the advantages, if any, of this unique feature in the TD-27 one piece dump trailer. As a result, Safapour decided to purchase trailers with the same mechanisms and operating features present in the Lufkin TD-27 dump trailers.[13] He testified that the TD-27 one piece type dump trailer had more strength and stability than the dump trailers Rapol formerly operated.[14]

Early in 1975 Safapour went to California to see certain construction machinery in operation and visited a factory turning out construction equipment. During this visit he met a Mr. White, a representative of Jahn in Los Angeles, and inspected a construction operation which used equipment Rapol was interested in.[15]

At the end of March, 1975 Safapour traveled to New York City and met White again and John Tashiro (Tashiro), Jahn's regional sales manager,[16] at the Jahn offices. Safapour testified that at this meeting the discussion included dump trailers Rapol intended to purchase,[17] price in particular. Safapour testified Tashiro quoted a price of $16,000 to $17,000 per unit for the TD-27 one piece dump trailer which he considered high. The discussion then turned to the feasibility of purchasing a unit without the box, the rationale being that such a unit would have less cubic volume and so save shipping costs. The boxes could then be constructed in Iran.[18]

Safapour testified that he did not visit Jahn's offices again but thereafter spoke with Tashiro over the phone. Safapour returned to Iran, a satisfactory price quotation not obtained on the TD-27 dump trailer without the box.[19]

6. T.T. 9, 155.

7. T.T. 9–13, 120–21.

8. T.T. 14–16. *See* Defendant's Exhibits A, D, E.

9. T.T. 15–16.

10. T.T. 16, Plaintiff's Exhibit 5–A.

11. T.T. 17.

12. T.T. 17–21, 27–28.

13. T.T. 28–29, 33.

14. T.T. 123.

15. T.T. 33–35.

16. T.T. 35–36, 91–92.

17. T.T. 36, 92–94.

18. T.T. 35–40.

19. *Id.*

Shortly after Safapour's return to Iran, Rapol received a price quotation from Jahn for trailers Safapour had discussed with Tashiro and White.[20] The price quotation, dated April 10, 1975, listed a unit price of $12,680 for a "LUFKIN MODEL TD–27 UNDERBODY FRAME..." (without the box).[21] After receiving this quotation, Rapol decided to purchase six (6) such Lufkin Model TD–27 underbody frames (without the box) and informed, Entezman of Iran Planing of its decision.[22]

Pursuant to Jahn's offer of April 10, 1975, Rapol was required to establish an irrevocable letter of credit for the total payment price of $76,080; Rapol proceeded to do so.[23] It established on May 17, 1975 a letter of credit with the Bank of Tehran in Jahn's favor; the letter of credit conditioned payment, which had to be stated in the invoice, on "6 Units Lufkin Model TD–27 Underbody frame., as per proforma invoice dated 10TH, April 1975...."[24] It also originally conditioned payment on shipment from the United States no later than July 15, 1975, but because of difficulties Lufkin encountered meeting that date, the letter of credit was amended to condition shipment no later than August 15, 1975.[25]

Counsel stipulated at trial that Jahn's commercial invoice (exhibit 10) was presented to the Irving Trust Company and payment was made thereon. The date of this payment was not disclosed at trial.[26]

The frames were shipped from the Port of Baltimore on July 17 or 18, 1975 aboard the El Tanio destined for Bandar Shahpour, Iran. The frames were shipped in two bundles of three frames each. Each bundle measured approximately 28 feet long, 8 feet wide, and 9 feet high and included crates containing miscellaneous equipment for the frames.[27]

Rapol received a notice of the arrival of the frames in the port of Bandar Shahpour on or about September 8, 1975. Mortezai-Faird then forwarded this notice on September 10, 1975 to the Ostir Company, Rapol's agent for clearing the goods through customs.[28] In 1975, delays of thirty to forty days from the time goods arrived in Bandar Shahpour and cleared customs was not unusual. A permit clearing the frames from Iranian customs was issued on September 17, 1975.[29] The frames were placed in the custom's yard.

Safapour testified that he next dealt with the frames in the beginning of October, 1975. The frames were to have been shipped directly to the Makbod factory, located in Teheran, where the boxes were to be constructed. However, as Safapour testified, there was a shortage of transportation facilities between Bandar Shahpour and Teheran and storage costs at the custom's yard were mounting. Therefore, the goods were shipped to an intermediate point, the Shustar camp (Shustar), a part of the Gotvand Irrigation project.[30] Shustar, located in Khouzestan province, was 200 miles from Bandar Shahpour; Teheran 700 miles from the port. Rapol used local transport to ship the goods by low bed trailer; the frames arrived at Shustar no earlier than October 10, 1975.[31]

When the frames, still packed in two bundles of three frames each, arrived at Shustar they were placed in a storage

---

**20.** T.T. 39–40.

**21.** Plaintiff's Exhibit 8.

**22.** T.T. 43–44.

**23.** T.T. 44, 172–75, Plaintiff's Exhibit 9.

**24.** T.T. 172–75, Plaintiff's Exhibit 9. The corresponding bank in New York was the Irving Trust Company. *Id.*

**25.** Plaintiff's Exhibit 9, Defendant's Exhibits L, M.

**26.** T.T. 46–47.

**27.** T.T. 134–35, Plaintiff's Exhibits 10, 11.

**28.** T.T. 170–72, Plaintiff's Exhibit 12.

**29.** T.T. 171–72, Defendant's Exhibit Q.

**30.** T.T. 52–54.

**31.** T.T. 53–54, 58–59, 133.

yard.[32] Safapour testified on cross-examination as to the circumstances relating to the frames while they were at Shustar:

Q. There [was] nothing preventing you from going up and look at them was there?

A. No.

Q. There wasn't anything preventing any other Rapol employee from going up and look at them?

A. No.

. . .

Q. The trailers were in a yard of some kind at Shustar?

A. Yes.

Q. Was that with a fence around it?

. . .

A. Yes.

Q. The yard was entirely under the control of Rapol?

A. Yes.

Q. And Rapol personnel would have access to the trailer chassis any time they wanted to?

A. Yes.

Q. Were you able to get any view out of your office window of the trailer chassis or was it just in your car going back or forth?

A. From the window or even when I walked out I could see the storage yard.[33]

Safapour on cross-examination also admitted that he had the opportunity to inspect the frames at Shustar:

Q. When you were at Shustar, you said that you saw the trailers bundled up, two bundles of trailers, is that correct?

A. Yes.

Q. And that was in October 1975, isn't that correct?

A. Yes.

Q. Now, when you saw the trailers bundled up, were they tied together with straps?

A. I didn't examine it, you know. I saw from a distance. I didn't go to them because they were not planned to stay in that location.

Q. But you will agree, sir, that at that time you had the opportunity to look at the trailers closely, isn't that correct? Yes or no?

. . .

A. Yes, I did.[34]

Despite this admitted opportunity to inspect the frames at Shustar, Safapour in fact did not:

THE COURT: In the light of your own experience[,] when these chassis were at Shushtar did it or did it not occur to you to examine what was there in order to determine whether you were getting what was ordered or not? Did it occur to you?

A. No, it didn't.[35]

Safapour further testified that the closest he ever got to the frames at Shustar was 100 meters.[36]

The frames were subsequently shipped from Shustar to the Makbod factory in Teheran, a distance of 500 miles. While the exact date of shipment from Shustar was not disclosed at trial, the frames arrived at the Makbod factory in the middle of November, 1975.[37]

Safapour testified that Makbod personnel informed him of a problem with the frames sometime between the 15th and 20th of November, 1975, and that this was the first time that he or Mortezai-Faird looked at the frames—*nearly two months after the goods had cleared customs and more than a month after they had arrived at Shustar.* Safapour testified that when he observed the frames at the Makbod factory, he no-

**32.** T.T. 136–37.

**33.** *Id.*

**34.** T.T. 66–67.

**35.** T.T. 139.

**36.** T.T. 136.

**37.** T.T. 51–52.

ticed they were similar in appearance to the dump trailer frames Rapol already had, but the spring configuration was different.[38] He further testified: "... I didn't notice anything about the height, length, thickness of chassis, anything. I didn't examine this. Q. There was nothing preventing you from making such an examination, was there? A. Really, I didn't have time, you know, to go through this because I wasn't expert and it didn't mean anything to me." [39]

From this cursory inspection of the frames, Safapour determined that Rapol could not use the goods and informed Mortezai-Faird of his conclusion. Entezman was subsequently informed that Rapol did not receive the correct goods and could not use the frames shipped.[40] A telex (exhibit 13) received by Jahn on November 25, 1975 reveals that Entezman informed Jahn of the problems with the frames. The pertinent portion reads:[41]

> RE SIX LUFKIN TRAILERS PURCHASED BY RAPOL CO. WE REGRET TO INFORM YOU THAT THE TRAILERS RECEIVED HERE ARE QUITE DIFFERENT FROM THE TRAILERS WE HAVE ORDERS, THESE TRAILERS ARE PLATFORM TRAILER MODEL THT 60 CALLED 'TRAILER CHASSIS' AS SHOWN IN THE CATALOGUE. OUR ORDER AND QUOTATION WAS FOR MODEL TD27 UNDER BODY FRAME. I PERSONALLY HAVE SEEN THE TRAILERS AT THE SITE. PLS CLARIFY THE CASE AND ADV. RAPOL DOES NOT WANT THESE TRAILERS AT ALL SINCE THEY WANTED THE TD27 TO BE USED AS A DUMP TRAILER.

Safapour testified that Rapol did nothing with the frames after November 25, 1975; that they are at present on a construction site near Teheran.[42]

The reason supporting the Rapol claim that it did not receive the frames it ordered was never fully disclosed at trial. However, correspondence between Jahn and Lufkin reveals that there was apparently a misunderstanding as to what frames Jahn, on behalf of Rapol, actually wanted or had ordered. A letter from W. T. Little, vice-president and general manager of Lufkin, dated June 12, 1975 and addressed to Tashiro acknowledged receipt of Jahn's order # 64660M, the order for TD–27 underbody frames. In addition, this letter stated that *Little was enclosing three copies of a drawing TC 1575* "which will give dimensional information on the chassis," and asked for a copy back with signed approval.[43]

On July 3, 1975 Tashiro acknowledged receipt of Little's letter of June 12, 1975 and the three drawings. In his letter Tashiro stated that the drawing had been forwarded to Iran, and since the shipment would be on the high seas, it would be impractical to return "a copy of the drawing with the Iranian customers approval." [44]

The trial record also reveals that by letter dated June 26, 1975 Tashiro wrote Entezman enclosing a copy of the Lufkin drawing TC–1575 and stated that the drawing was enclosed so that Rapol could make preparations for the steel necessary to fabricate the boxes.[45]

The next correspondence between Little and Tashiro was by letter dated December 30, 1975. It acknowledged receipt of two letters from Little dated December 1 and 15, 1975. Tashiro stated that he had no recollection of a conversation with Little as suggested in Little's letter; that it would be impractical and almost impossible to construct and attach a box to the TD–27; that his recollection of any such telephone conversation was that Lufkin could invoice

38. T.T. 60–62; 142; 172.

39. T.T. 142.

40. T.T. 60–62, 172.

41. Plaintiff's Exhibit 13.

42. T.T. 65.

43. Plaintiff's Exhibit 16.

44. Plaintiff's Exhibit 17.

45. Plaintiff's Exhibit 15.

Jahn directly for their order of six (6) TD–27 underbody frames; and that if there was a change in the configuration of the frames, he, Tashiro, would have had to gain approval of its Iranian customer.[46]

The last correspondence was a letter from Entezman to Tashiro dated January 27, 1976 which acknowledged receipt of an earlier letter from Lufkin. Entezman stated therein that he was "surprised" that Lufkin asserted it had discussed with Jahn and gained approval concerning the type of chassis actually shipped. The letter further stated that "to change the description of an order of a big amount is not so easy to be done by a telephone conversation, if there has ever been such a telephone discussion and agreement"; and ". . . I am glad to note that you have never given to Lufkin such an approval."[47] Suffice it to say that the Lufkin diagram was neither signed nor returned to Lufkin.

\* \* \* \*

On November 5, 1976 Rapol filed its complaint in the instant action against Jahn asserting that: (1) Jahn shipped non-conforming goods which were not fit for the particular purpose intended, causing plaintiff to suffer loss of profits as well as incidental and consequential damages; and (2) Jahn made "false representations" by presenting the commercial invoice and receiving payment under the letter of credit despite the fact that the invoice incorrectly stated the goods actually shipped.

On February 1, 1977 Jahn filed its third-party complaint impleading Lufkin for any damages for which Jahn may be found liable to Rapol.

Because of deteriorating diplomatic relations between the United States and Iran (as early as 1977) and inherent difficulties in the discovery process, this case was placed on the suspense calendar until September, 1981.

### The Law

In this diversity action, where concededly New York law applies,[48] the Uniform Commercial Code-Sales (UCC) governs since the underlying transaction here deals with contracts for and the sale of certain truck chassis.[49] Accordingly, we turn to the requisite statutory framework necessary to our analysis.

### a. Statutory framework

Once goods have been delivered by the seller[50] or its intermediary to the buyer[51] the UCC *mandates* that the buyer take affirmative steps. The buyer must *in limine* either accept or reject the goods.[52] *"Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."* (emphasis ours).[53] On

---

46. Defendant's Exhibit X.

47. Defendant's Exhibit Y.

48. Because an independent basis for jurisdiction exists here, we need not resolve defendant's attempt at eliminating access to Federal courts by contract. See Plaintiff's Exhibit 8A, ¶ 7. But see *Martin v. City of Cohoes*, 37 N.Y.2d 162, 371 N.Y.S.2d 687, 690, 332 N.E.2d 867, 869 (1975) (parties may contract for the application of New York law).

49. The scope section of Article 2, UCC § 1–102, states ". . . this Article applies to transactions in goods. . . ." Goods are defined in UCC § 2–105(1) as ". . . all things which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid. . . ." Truck chassis are goods within the aforementioned definitions. Cf. *Rivara v. Stewart & Co.*, 119 Misc. 73, 195 N.Y.S. 841 (1922).

50. " 'Seller' means a person who sells or contracts to sell goods." UCC § 2–103(1)(d). Jahn is a seller here.

51. " 'Buyer' means a person who buys or contracts to buy goods." UCC § 2–103(1)(a). Rapol is a buyer.

52. Acts constituting acceptance or rejection are mutually exclusive under UCC § 2–607(2) ("Acceptance of goods by the buyer precludes rejection of the goods accepted. . . .").

53. UCC § 2–602(1). "Notifies" is defined as follows:

"A person 'notifies' or 'gives' a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person 'receives' a notice or notification when

the other hand, "Acceptance of goods occurs when the buyer ... *after a reasonable opportunity to inspect the goods* signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or ... *fails to make an effective rejection* ... but such acceptance does occur until the buyer has had a reasonable opportunity to inspect them; [54] or does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is acceptance only if ratified by him." (emphasis ours)

Assuming *arguendo* the goods are accepted [55] by any step taken as aforementioned and further that the buyer thereafter learns of a non-conformity, "... *the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. . . .*" (emphasis ours) [56] "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification

> (a) it comes to his attention; or
> (b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications."
> UCC § 1–201(26).
> Further,
> "A person has 'notice' when
> (a) he has actual knowledge of it; or
> (b) he has received a notice or notification of it; or
> (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.
> A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' of a word or phrase of similar import refers to knowledge rather than to reason to known. The time and circumstances under which a notice or notification may cease to be effective are not determined by this act."
> UCC § 1–201(25).
> The buyer's rights and obligations with respect to goods tendered but rejected, not at issue here, are governed by UCC §§ 2–602(2) and (3), 2–603, 2–604.

54. UCC § 2–606. The buyer's right to inspect is fortified by a separate provision: "... the buyer has a right before payment or acceptance to inspect [goods] at any reasonable place and time and in any reasonable manner. When the

which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer. . . . The notification ... need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." [57] Simultaneous with such notification or thereafter,[58] "[t]he buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it ... without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. . . . *Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it . . . . It is not effective until the buyer notifies the seller of it.* A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them." [59] (emphasis ours.)

> seller is required or authorized to send the goods to the buyer, the inspection may be after their arrival." UCC § 2–513(1). "The last sentence ... makes it clear that the place of arrival of shipped goods is a reasonable place for their inspection." UCC § 2–513, Comment 3.

55. "[A]cceptance does not of itself impair any other remedy provided by this Article for non-conformity." UCC § 2–607(2).

56. UCC § 2–607(3)(a). Remedy "means any remedial right to which an aggrieved party is entitled with or without resort to a tribunal." UCC § 1–201(34).

57. UCC § 2–607(3)(a), Comment 4.

58. There is a surprising dearth of authority addressing the issue of when revocation of acceptance must occur in relation to notification of breach. Comment 4 to § 2–608 indicates that since "...this remedy will be generally resorted to only after attempts at adjustment have failed, the reasonable time period should extend in most cases beyond the time in which notification of breach must be given. . . ." See also White & Summers, Uniform Commercial Code, § 8–3 at pp. 260–61, fn. 30.

59. UCC § 2–608(1)–(3).

### b.  *Reasonable time*

A common principle which permeates the entirety of the foregoing statutory model as well as other provisions of the UCC [60] is that of "reasonable time."  At each stage of the model, acceptance or rejection, notification of breach or revocation of acceptance, the UCC demands that *the buyer act within a reasonable time.* [61]  Reasonable time is defined as follows: "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." [62]

A recognition of the underlying policies fostered by this requirement is necessary to understand why the law makes such a provision an absolute imperative and severely penalizes buyers or sellers who fail to comply with it.

Initially, a buyer who notifies a seller of a defect, etc. within a reasonable time ". . . enables the seller to make adjustments or replacements or to suggest opportunities for cure *to the end of minimizing the buyer's loss and reducing the seller's own liability to the buyer.*" [63]  Clearly, in this modern business oriented world, there is no stronger mutual interest which any buyer or seller has.  Undoubtedly this policy prompted one court to remark about provisions similar to these, "[they are] the essence of fair business dealing."  *Milz & Cie v. Bloomfield*, 146 Misc. 649, 262 N.Y.S. 580, 581 (1932).

Secondly, these provisions afford ". . . the seller an opportunity to arm himself for negotiation and litigation." [64]  In other words, "[t]he purpose of [these provisions] is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning."  *American Mfg. Co. v. U. S. Shipping Board*, 7 F.2d 565, 566 (2d Cir. 1925).  This too is nothing more than a policy which is the essence of business reality.  It gives the seller the earliest opportunity to confront the business problems which his transactions create.  Additionally, this early confrontation (and often resolution) improves any good will created by the seller as well as reduces the necessity of in-court determinations in a system whose resources are clearly inadequate to meet such additional demands.[65]

Thirdly, the "reasonable time" requirements give ". . . the defendant that same kind of mind balm he gets from the Statute of Limitations.  There is some value in allowing a seller [or buyer], at some point, to close his books on goods sold [or bought] in the past and to pass on to other things." [66]  Williston put it another way when dealing with a similar provision in the Uniform Sales Act (the UCC's immediate predecessor): "The purpose . . . [is to avoid] the hardships on the seller [or buyer] of allowing a buyer [or seller] at any time within the period of the Statute of Limitations to assert that the goods are or were defective though no objection was made when they were received." [67]

Finally, the articulated underlying purposes and policies of the UCC are fostered by prompt action.  The relevant purposes and policies here are ". . . to simplify, clarify and modernize the law governing commercial transaction;  . . . [and] to permit the continued expansion of commercial

---

**60.**  See §§ 2–201(2), 2–206(2), 2–207(1), 2–309, 2–311(3), 2–319(3), 2–325(1) and (2), 2–327, 2–402(1), 2–503(4), 2–508, 2–511, 2–513, 2–602, 2–604, 2–605, 2–607, 2–608(2), 2–609(4), 2–612(3), 2–615(c), 2–616(2), 2–723, 3–304(4)(c), 3–503, 3–505(2), 3–507(1)(a), 3–803, 4–202(2), 4–207(4), 4–213(4)(a), 7–204(3), 7–603, 8–316, 8–404, 9–504.

**61.**  Because there is no writing between the parties concerning the time in which to act after delivery, seasonable is included within the definition of reasonable.  UCC § 1–204(3).

**62.**  UCC § 1–204(2).

**63.**  White & Summers, *Uniform Commercial Code* § 11–9 at p. 344.  (emphasis added)

**64.**  *Id.*

**65.**  See e.g., Report of the Circuit Executive for the Second Circuit (1980).

**66.**  White & Summers, *Uniform Commercial Code* § 11–9 at p. 344.

**67.**  2 Williston on Sales, p. 1259 (2d ed. 1924).

practices through custom, usage and agreement of the parties. . . ." [68]

The longevity of the UCC as a realistic mien of controlling commercial behavior depends in large part on the continued fluidity and growth of business transactions. *Nothing could foster that growth more than demanding that these transactions come to a final disposition as soon as is practicable.* To that end, the demand that buyers (as well as sellers) act within a reasonable period of time may be viewed as a *sine qua non.*

c. *Our findings*

Initially, we must determine whether the goods were accepted by Rapol.[69] Under the applicable provisions (see a. *supra*) Rapol must reject the goods within a reasonable period of time after having a reasonable opportunity to inspect them or be deemed to have accepted them. The principal is well founded and not new in law:

> [I]f the thing purchased is found, on examination, to be unsound, or not to answer the order given for it, [the vendee] must immediately return it to the vendor, or give him notice to take it back, and thereby rescind the contract, or he will be presumed to have acquiesced in its quality. *He cannot accept the delivery of the property, under the contract, retain it, after an opportunity of ascertaining its quality, and recover damages, if it be not of the quality or description called for by such contract. . . .* Reed v. Randall, 29 N.Y. 358, 362–63 (1864) (emphasis ours).

\* \* \* \* \*

The goods arrived in Bandar Shahpour thirty or forty days prior to receipt of the notice of arrival on September 8, 1975. The proof advanced at trial indicated that it was not uncommon for Iran customs to take 30 to 40 days to inspect goods upon arrival. That period of time can not and does not affect Rapol's unfettered right to inspect

these goods before accepting. *Freier v. Shayani,* 16 Misc.2d 31, 183 N.Y.S.2d 198 (1958) (action under New York Personal Property Law §§ 129–30). In essence then, the clock tolled the determination of a reasonable time for accepting or rejecting until Rapol had access to the goods.

On September 17, 1975 the six chassis here involved cleared Iranian customs and were held at port. Safapour testified that the goods were moved from the port to a labor camp, Shustar, and arrived there no later than October 10, 1975—some three and a half weeks after they were first made available to Rapol. Not a word of explanation for this inordinate delay was offered at trial.

We would be remiss if we failed to emphasize as outrageous the lethargy, tantamount to laches, committed by Rapol. We can not envision under any standard of reasonableness, taking into consideration the nature, purpose and circumstances of this transaction, that Rapol could not have inspected these goods long before October 10, 1975. Not even a shadow of revelation on that score exists in the total trial record. It is certainly no answer to say that the seller was compelled to wait until the goods arrived in Teheran, the place where the boxes were to be constructed, before learning the buyer's decision to accept or reject. This equipment was vital to Rapol's enormous construction project. Once this equipment cleared customs, Rapol should and could have taken even *de minimis* efforts toward determining whether the chassis conformed to its order. Safapour admitted that he and/or his employees could have inspected the goods when they arrived at Shustar.

The buyer's failure is worthy of double condemnation when we consider its complete silence lasted not only three and a half weeks (September 17 to October 10)—from the availability of the goods at port to its arrival at Shustar—but *two months* (Sep-

---

**68.** UCC § 1–102(2)(a) and (b).

**69.** We need not resolve the issue of whether or not the original contract of April 10, 1975 was

modified; it is unnecessary to our disposition. See *infra.*

tember 17 to the middle of November)—from the goods at port to the goods in Teheran!

■ No matter what legally condemned failures, infirmities, oversights or inadequacies were or were not committed by Jahn or Lufkin, the plaintiff buyer cannot hold the seller accountable in law unless and until plaintiff first fulfilled (as with a condition precedent) its own legally defined imperative or inviolate obligation to accept or reject the goods within a reasonable time. Beyond cavil, this the plaintiff failed to do in the extreme—a legally inexcusable omission for which plaintiff has only itself to blame. Its unreasonable silence over an amazingly extensive time period resulted in the legal stamp of acceptance.

We are compelled to observe that it is precisely this type of conduct on behalf of a purchaser which thwarts the sound policies underlying the necessity in commercial transactions to act within a reasonable period of time. The official comments to the right of inspection provision (UCC § 2–513) indicate that the place of arrival of shipped goods, here Bandar Shahpour, affords a reasonable opportunity to inspect. If to accommodate its construction objectives, Rapol decided to allow the chassis to remain at the port until it was ready to put them in operation, it could have sent there a few men with tools to open up the packages, set up and test the chassis. If unsatisfactory disclosures resulted, rejection of the goods within a reasonable time could have taken place. Thereafter plaintiff buyer was at liberty to handle the chassis in any manner it selected. All this applies with double force when the chassis sat at Shustar.

In situations like this, where the facts are not in dispute and only one conclusion can follow, New York courts have held that the determination of reasonable time is a matter of law:

What is a reasonable time ordinarily is a question of fact and ordinarily should be left to the jury; but where the evidence as to the controlling circumstances is undisputed and not conflicting and the permissible inferences therefrom admit of only one conclusion the question becomes one of law. *Roth v. Buffalo & State Line R. Co.*, 34 N.Y. 548, 552; *Hazzard v. Flury*, 120 N.Y. 223, 225, 24 N.E. 194; *Wass v. Stephens*, 128 N.Y. 123, 127, 28 N.E. 21, 22; *Jerome v. Queen City Cycle Co.*, 163 N.Y. 351, 357, 57 N.E. 485, 486; *Rawson v. Leggett*, 184 N.Y. 504, 512, 77 N.E. 662, 664; *McCarty v. Natural Carbonic Gas Co.*, 189 N.Y. 40, 47, 81 N.E. 549, 550, 13 L.R.A., N.S. 465; *Tousey v. Hastings*, 194 N.Y. 79, 86 N.E. 831; *Brown & Lowe Co. v. Potolski*, 221 App.Div. 299, 300, 223 N.Y.S. 71, 72; *Glicman v. Barker Painting Co.*, 227 App.Div. 585, 587, 238 N.Y.S. 419, 421; *Babor v. Goldberg*, 258 App.Div. 230, 16 N.Y.S.2d 197; *Bell v. Carter*, 8 Cir., 164 F. 417, 19 L.R.A., N.S., 833; *Muskogee Land Co. v. Mullins*, 8 Cir. 165 F. 179; *Hayes Wheel Co. v. American Distributing Co.*, 6 Cir., 257 F. 881, 889; *Holland v. Director General of Railroads*, 3 Cir., 273 F. 928; *Boothby v. Scales*, 27 Wis. 626, 638.

*House of Price v. Kliegman Bros., Inc.*, 126 N.Y.S.2d 764, 767 (Sup.Ct.1953).[70]

**70.** "It is sometimes said that reasonable time is a question of law, or a mixed question of law and fact; neither is strictly correct. Properly speaking, there is no such thing as a mixed question of law and fact. There are issues, propositions, conclusions, what is known in pleading as ultimate facts, the solutions of which depends on the previous determination of perhaps several questions of fact and questions of law; but these subsidiary questions are themselves each a separate question of law or of fact. There cannot in the nature of things be a simple or single question which depends for its solution partly on matter of law and partly on matter of fact. *Reasonable time means*

*what under the circumstances a reasonable, prudent man would do, and is always, it would seem, properly speaking, a question of fact, with the usual proviso, however, that whether there is any evidence to support a finding of fact is a question of law, and this is doubtless all that is meant by the statement often found in the cases that the question of reasonable time is for the court." Hesse v. Gude Bros.-Kieffer Co.*, 170 N.Y.S. 211, 213 (Sup.Ct.1918) (emphasis ours). See also *White Devon Farm v. Stahl*, 88 Misc.2d 961, 389 N.Y.S.2d 724 (1976); *Liquid Carbonic Corp. v. Caroombas*, 132 Misc. 866, 230 N.Y.S. 529 (1928); *Maggioros v. Edson Bros.*, 164 N.Y.S. 377 (Sup.Ct.

Accordingly, we find that Rapol accepted these goods at the absolute latest (making allowance for possible delays incidental to the trip) on October 10, 1975 by its failure to reject within a reasonable period of time under UCC §§ 2–602 and 2–606(1)(b). *Miron v. Yonkers Raceway*, 400 F.2d 112 (2d Cir. 1968).

As noted earlier, acceptance alone did not bar Rapol from pursuing its remedies. However, what then ensued—facts critical to the viability of Rapol's claims under the UCC—positively precludes its claim.

The six chassis sat in Shustar for an undisclosed period of time and were then shipped to the Makbod factory in Teheran, arriving there in mid-November, 1975. Again, these facts warrant only one conclusion: Rapol failed to do anything whatever much less act within a reasonable period of time.

Having accepted the goods, Rapol upon learning of any non-conformity was compelled by law to notify the seller of any defect within a reasonable time after it discovered or should have discovered the non-conformity. The penalty imposed for non-compliance with this imperative bars the purchaser from any remedy.[71]

Safapour testified that he first learned of the alleged non-conformities between November 15 and 20, 1975—some two months after the goods cleared customs on September 17, 1975 and one month after they arrived at Shustar. *It was not before November 25, 1975 that Rapol for the first time telexed Jahn regarding alleged non-conformities.*[72]

■ Simply put, this egregious lapse of time between acceptance (at the latest Oc-

tober 10, 1975) found as a matter of law, and notification of breach (November 25, 1975) outrages the law's sense of fair play. The seller was entitled to very much more from the buyer, in terms of prompt action, than Rapol offered here. *Waxman v. Biemme Societa per Aziono*, No. 79 Civ. 6836, unreported opinion (S.D.N.Y.1981); *Nederlandse Draadindustrie v. Grand Pre-Stressed Corp.*, 466 F.Supp. 846 (E.D.N.Y. 1979); *In re Instruments for Industry, Inc.*, 496 F.2d 1157, 1160 n.5 (2d Cir. 1974); *International Paper v. Margrove*, 75 Misc.2d 763, 348 N.Y.S.2d 916 (1973); *Alafoss v. Premium Corporation of America*, 599 F.2d 232 (8th Cir. 1978).

Accordingly, we find that Rapol has not met its burden of proof that it notified Jahn of "any breach" within a reasonable period of time and is therefore barred from any remedy including revocation of acceptance. *See, e.g., Standard Alliance v. Black Clawson*, 587 F.2d 813 (6th Cir. 1977). *See generally*, White & Summers, *Uniform Commercial Code* § 11–9 at p. 343.

Even assuming, *arguendo*, that our analysis could extend beyond this fatal defect, the same result would obtain. Simultaneous with or within a reasonable time thereafter, Rapol could have revoked its acceptance under UCC § 2–608. However, in order to avail itself of this remedy, Rapol would have had to prove at trial that: (1) the non-conformity of the six chassis accepted "substantially impaired" its value to Rapol; and (2) Rapol notified Jahn of its revocation within a reasonable period of time after it discovered or should have discovered the defect(s).[73]

---

1917); *Jarstad v. Tacoma Outdoor Recreation, Inc.*, 14 U.C.C. 695 (Wash.C.A.1974); *Steel & Wire Corp. v. Thyssen Inc.*, 20 U.C.C. 892 (E.D. Mich.1976); *Carl Beasley Ford, Inc. v. Burroughs Corp.*, 12 U.C.C. 1070 (E.D.Pa.1973).

**71.** This provision also affects plaintiff's "fraud" claim. See d. *infra*.

**72.** Our resolution here obviates the necessity of any ruling with respect to the issues relating to the content of the notification. See UCC § 2–607, Comment 4. Further, we need not

determine whether or not Rapol is a merchant (as opposed to a retail consumer) for purposes of reasonable time notification because even under the latter, more liberal standard, Rapol did not notify within a reasonable period of time.

**73.** Again, our disposition does not require analysis of or comment on the content of the alleged notification here. UCC § 2–608, Comment 5.

As to the first element necessary for relief under UCC § 2–608, Rapol offered no proof whatsoever. Indeed, the striking silence in the record of any proof on this vital issue compels the only permissible conclusion that Rapol failed as a matter of law to prove its substantive right to the relief it sought. *See, e.g., Curtis v. Fordham Chrysler Plymouth, Inc.,* 81 Misc.2d 566, 364 N.Y. S.2d 767 (1975).

As to the second element, we are left without vital or convincing proof sufficient to sustain the assertion that Rapol notified Jahn of its revocation of acceptance within a reasonable period of time. Over one month passed from the time these goods arrived at Shustar before Rapol even learned of the alleged non-conformity of the chassis despite numerous overwhelmingly clear and reasonable opportunities which patently existed.

The chassis sat in Shustar; Safapour was no more than 100 meters from them; he had one thousand employees on hand or at his disposal. This is not a situation where a plaintiff offered proof of difficulty of inspection because of the nature of the goods or even lack of opportunity to act—rather, a complete and inexplainable failure to do anything with respect to notification of a breach followed by revocation. *See, e.g., Lanners v. Whitney,* 4 UCC Rep. Serv. 369 (1967).

Further, any argument that the determination of reasonable time to give notice of revocation of acceptance should extend beyond the time within which notification of "any breach" occurs and thus saves plaintiff's remedies under the UCC, falls flat in light of the reality which confronts us here. Rapol failed to do anything with respect to these goods for at least two months. It is not the timing of sequential events that concerns us, but rather the total failure to act within a reasonable time. Additionally, the only reasonable conclusion here is that

Rapol attempted to notify Jahn of a breach and revoke acceptance at the same time— far outdistancing "reasonable time." The only proof offered at trial regarding notification (of any kind) was the November 25, 1975 telex (exhibit 13). Certainly a seller can not be expected to operate its business to suit the whim of the purchaser.[74]

Accordingly, we find that Rapol has not met its burden of proof that it had a substantive right to, and made the necessary notification for, revocation of acceptance. *Curtis, supra; Solar Kinetics v. Ryerson,* 488 F.Supp. 1237 (D.C.Conn.1980); *Nelson v. Heuckeroth,* No. 74 Civ. 2354, unreported opinion (S.D.N.Y.1978); *Republic Corp. v. Procedyne Corp.,* 401 F.Supp. 1061 (S.D.N. Y.1975).

### d. *The fraud claim*

In its first claim for relief, Rapol alleges liability against Jahn based on "false representations." Rapol asserts that Jahn, pursuant to the April 10, 1975 agreement, presented to the Irving Trust Company the commercial invoice (exhibit 10) describing the TD–27 underbody frames as the shipped goods; received payment under the terms of the letter of credit; and that in fact such frames were not shipped.[75] Rapol further asserts that, "[b]y shipping goods contrary to description on the invoice submitted for the letter of credit, Jahn is liable for commercial fraud ..." and cites as support *Smith v. Richards,* 13 Pet. 26, 10 L.Ed. 42 (1839).[76]

For reasons set forth below, we conclude that this claim for relief must likewise be dismissed.

Rapol does not allege that it was fraudulently induced to enter into the contract for the six TD–27 underbody frames, or that Jahn made any contractual promise with the undisclosed intention of not performing it—allegations essential to a true fraud claim.

---

**74.** We do not intimate that Jahn's conduct here is not without fault. Yet we hasten to add that Jahn could only be held to account in law if Rapol had complied with the very reasonable provisions of the UCC.

**75.** See Complaint, filed November 5, 1976, ¶¶ 1–7.

**76.** Plaintiff's Pre-Trial Memorandum, pp. 5–7.

The gravamen of this claim is that Jahn did not properly perform its contractual obligations—it shipped the wrong goods—and nevertheless received payment for them.

Under New York law, one who makes a contractual promise "with the undisclosed intention not to perform it" can be held liable for fraud. *Sabo v. Delman*, 3 N.Y.2d 155, 162, 164 N.Y.S.2d 714, 718, 143 N.E.2d 906, 909 (1957). Likewise, one who fraudulently induces another to enter into a contract can be liable under a fraud claim. *See Wegman v. Dairylea Cooperative, Inc.*, 50 A.D.2d 108, 376 N.Y.S.2d 728, 734 (4th Dept. 1975). However, where the complaint merely alleges, in essence, the non-performance of a contractual obligation, an action in fraud will not lie; "actionable fraud depends on more than a showing of non-performance," *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 575 (2d Cir. 1969), or a "mere breach of a contract." *Nolan v. Williamson Music, Inc.*, 300 F.Supp. 1311, 1316 (S.D.N.Y.1969). *See Wegman, supra; Miller v. Volk & Hukley Inc.*, 44 A.D.2d 810, 355 N.Y.S.2d 605 (1st Dept. 1974).

Here, what Rapol is really complaining of is a breach of the contract for TD–27 underbody frames, and the terms of payment recited therein. Even though Rapol chooses to characterize this claim as one for fraud or "false representations,"[77] the catalytic event of it was a breach of contract. As one New York court has stated, "[i]n the instant case plaintiff's allegations of fraudulent misrepresentation relate only to the specific terms of the . . . contract and, therefore, plaintiff's theory of recovery is necessarily limited to a suit for breach of contract." *Wegman, supra*, 376 N.Y.S.2d at 735. Here we find that Rapol's allegations relate only to the "specific" payment and description terms of its contract with Jahn. Any theory of recovery is then limited to breach of contract.

The contract between Rapol and Jahn is governed, as heretofore stated, by Article Two of the Uniform Commercial Code, for the contract relates to transactions in goods.[78] Further, any damage recoverable for the instant claim is likewise governed by the applicable sections of this Article.

As with the other claims for relief asserted by Rapol, we find that recovery here is also barred by the operation of UCC § 2–607(3)(a): "[T]*he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . .*" (emphasis ours) "Remedy" is defined as "any remedial right to which an aggrieved party is entitled. . . ." UCC § 1–201(34).

Therefore, we conclude that Rapol is barred from recovery because it failed to notify Jahn, within a reasonable time, of any contractual breach. UCC § 2–607(3)(a).[79]

Even if we were to interpret, as it suggests, Rapol's allegations to include a claim for "fraud," wholly separate and completely independent from the underlying contract transaction, we would nevertheless be compelled to dismiss this claim because of Rapol's complete failure to offer any proof to support the critical elements of such a claim.

---

**77.** Plaintiff's Pre-Trial Memorandum, p.5; Complaint, filed November 5, 1976, ¶ 6.

**78.** UCC § 2–102.

**79.** Any argument which Rapol could advance based on UCC § 1–103 would be misplaced. This provision states:

Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresenta-

tion, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

We recognize that a claim for relief based on fraud is not displaced by the UCC, and in fact the common law supplements it. However, here we find simply that Rapol's claim is not one for fraud but one based in contract, and any right to recovery thereunder must be based on a breach of contract theory and applicable UCC provisions.

In support of its fraud claim Rapol as heretofore stated relies primarily on a United States Supreme Court decision, *Smith v. Richards*,[80] decided in 1839. That case supports the proposition that liability for fraud may be found on an innocent misrepresentation. However, the *Smith* decision was based on an equity claim for recision of a land contract. Here, Rapol has asked for no equitable relief, only monetary damages.[81] Accordingly, the *Smith* decision is not persuasive.

■ Further, even if we assumed Rapol intended to bring this "fraud" claim under current New York law, the following essential elements would have to be established: (1) material misrepresentation of an existing fact; (2) falsity; (3) scienter; (4) deception and (5) injury. *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958); *Hong Kong Export Credit Ins. v. Dun & Bradstreet*, 414 F.Supp. 153, 158 (S.D.N.Y.1975). The trial record is barren of proof applicable thereto. The scienter element of such a claim may be founded upon proof of an intentional misrepresentation or a representation made with reckless indifference to the truth. *Philo Smith & Co. v. Uslife Corp.*, 420 F.Supp. 1266, 1272 (S.D.N.Y.1976); *Hong Kong Export, supra*, 414 F.Supp. at 158–59.

■ The only facts adduced at trial which in any way relate to this "fraud" claim show that a letter of credit was established by Mortezai-Faird; Jahn presented a commercial invoice for TD–27 underbody frames; Jahn was paid pursuant to the terms of the letter of credit; frames other than TD–27's were shipped. No proof whatsoever was adduced by Rapol regarding scienter.

Accordingly, we are compelled to dismiss Rapol's "fraud" claim.

*Conclusion*

At the close of plaintiff's case, we were struck by the complete lack of objective and/or convincing proof to support the complaint in its entirety. On the contrary, the entire trial record, as heretofore shown, leads to conclusions fatal to plaintiff's claims. Even if we had allowed this case to go to the jury, our conscience and oath would demand that we impose the same judgment we have reached here notwithstanding the jury's verdict.

The Supreme Court has stated that:

When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial, the result is saved from the mischance of speculation over legally unfounded claims.

*Brady v. Southern Railroad*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

The egregiousness exhibited by plaintiff's imprudent commercial conduct here demands the only reasonable determination: Its claims are legally unfounded.

Accordingly, we are constrained to, and do, direct the verdict in favor of defendant and dismiss the complaint in all respects. Because the third party complaint is for indemnification, it is also dismissed in all respects.

SO ORDERED.

---

**80.** 13 Pet. 26, 10 L.Ed. 42 (1839).

**81.** Plaintiff's complaint reads in part: "Wherefore, plaintiff respectfully prays: ... 2. That judgment be entered in favor of plaintiff and against defendant in the amount of $76,080.00 together with interests and costs on the First Cause of Action." Complaint, filed November 5, 1976, p. 5.