Rex C. CAUBLE, Plaintiff,

·v.

MABON NUGENT & CO., et al., Defendants.

No. 82 Civ. 7176 (ADS).

United States District Court, S.D. New York.

Aug. 28, 1984.

Gersten, Savage & Kaplowitz, New York City, for plaintiff; Marvin Gersten, Paul J. Giacomo, Jr., New York City, of counsel.

Cadwalader, Wickersham & Taft, New York City, for defendants; Michael Gerard Dolan, Earl H. Nemser, Joseph Polizzotto, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge.

Plaintiff Rex Cauble ("Cauble") brought this action against Mabon, Nugent and Co. ("Mabon"), a commodities brokerage partnership, and two of its general partners, Jeffrey Pollack and Leon Pollack, seeking relief on nine causes of action under both the Commodity Exchange Act ("CEA") and state law. Four counts—including fraudulent trading under § 4b of the CEA, 7 U.S.C. § 6b (1982), aiding and abetting under § 13 of the CEA, 7 U.S.C. § 13c (1982),

negligence and gross negligence under state law—stem from the allegedly wrongful liquidation of Cauble's commodity account by Mabon on July 8, 1982. Four additional counts—including fraudulent inducement under § 4b of the CEA and under state law, conversion, and aiding and abetting under § 13 of the CEA—arise out of a settlement agreement between the parties and Cauble's payment of $174,755.00 to Mabon on August 4, 1982. Plaintiff also alleges that in late August 1982, Mabon interfered with Cauble's business relationship with the clearing house of Bear, Stearns & Co., and caused the clearing house to cancel a commodities account for Cauble with Miller, Tabak and Hirsch. Defendants initially moved to dismiss the complaint and on February 25, 1983 this court dismissed the claim for punitive damages. After additional discovery, defendants now move for summary judgment on all nine counts, and incorporate the affidavits submitted on the motion to dismiss.

Cauble, a Texas resident, opened an account with Mabon in April 1982 for the purpose of trading in commodity and financial futures. Though Mabon maintained an office in Houston, Texas, where Cauble's cousin Alan Harp was a registered representative, Cauble's orders were placed through Mabon's New York office where Mabon partner, defendant Leon Pollack, and a Mabon employee, Joe Belanoff, generally managed the transactions. Cauble also assumed financial responsibility for accounts opened with Mabon for his son, Lewis Cauble, and for a friend, Fern Lynch.

On April 20, 1982, Leon Pollack sent Cauble a letter explaining how his trades would be executed and enclosed forms which were provided to Mabon by Goodman-Manaster & Co. ("Goodman"). He explained that Mabon, though a registered futures commodity merchant (FCM), was not a clearing member of the Chicago Board of Trade or the international monetary market of the Chicago Mercantile Exchange where the financial futures Cauble was interested in were traded. Cauble's orders would therefore be executed by Goodman, a clearing broker on those exchanges. According to Pollack's letter, Goodman would send daily confirmations of trades directly to Cauble but Cauble would have direct contact only with Mabon in submitting orders and providing sufficient margin to maintain the positions in his account. Cauble signed and returned the Goodman customer application, agreement, and risk disclosure. Among other things, the customer agreement signed by Cauble provided for the closing of all positions in the account without prior notice or demand if the proper margin was not maintained in the account.

A course of dealing was established between the parties whereby Cauble communicated with Mabon directly, by telephone, on a daily basis. His account was non-discretionary and therefore his authorization was required for each transaction. Cauble received daily statements of transactions and sent periodic payments by checks drawn on the Cauble family bank to Mabon via Federal Express to meet margin requirements. Mabon normally extended credit to Cauble by forwarding its own funds to satisfy Cauble's initial and maintenance requirements directly to Goodman. Cauble then made up the deficits created in his accounts by either transferring checks or off-setting trades.

By June 1982, the trading activity in Cauble's account reached very high levels. On July 2, 1982, Cauble's account showed a deficit of over $500,000. Although Cauble failed at that time to settle-up with Mabon, he was allowed to continue trading in his account as usual. The deficit in his account at the close of business on July 6 was $563,112.50. On July 7, an agreement was made between Cauble and Joe Belanoff, the normal account executive assigned to his accounts, that his position would be offset to reduce it to 100 financial futures contracts and a long position in 30 silver futures contracts. At the close of trading on July 7, the deficit in Cauble's account was $394,050. That same day, Jeffrey Pollack and John Friel decided not to accept any new orders from Cauble, and advised

him on the morning of July 8 to send in the required margin so that Mabon could continue accepting his trades. Cauble did not clear up his margin deficiency but nevertheless attempted to place a trade to sell short 50 U.S. Treasury Bond futures, a transaction defendants claim they did not execute. Instead, when Cauble's margin check did not arrive by 1:00 p.m. in Mabon's usual Federal Express delivery, Mabon placed orders with Goodman that effectively closed out all positions in Cauble's account.

After liquidation, there was a deficit in Cauble's account at Mabon. From July 23 to August 3, Cauble actively negotiated with Joe Belanoff and Leon Pollack over payment of the deficit balance in his account, in addition to the $69,000 deficit in the Lewis Cauble and Fern Lynch accounts which had been closed with Cauble's agreement. Upon the completion of a long series of negotiations between Cauble and Mabon, an agreement was reached for the exchange of a payment by Cauble to Mabon of $174,785 in return for a promised release. Plaintiff alleges that the release was to contain a number of specific provisions agreed upon by the parties. Instead, Mabon sent a standard release after receiving Cauble's check. Cauble rejected the standard release and demanded the return of his check.

On August 24, 1982, Joe Belanoff, who had left Mabon to join Miller, Tabak and Hirsch ("MT & H"), contacted Cauble and obtained his agreement to open a new commodity trading account at MT & H. The Cauble account at MT & H was cleared through Bear, Stearns & Co. After a week, the account was closed out by Bear, Stearns. Cauble alleges that this liquidation was the result of a negative report circulated throughout the investment community by Mabon.

## I. *Claims of Unauthorized Liquidation*

Cauble claims in Count One of his complaint that Mabon violated section 4b of the CEA by unauthorized and fraudulent trading in the closing of Cauble's account without notice. A futures commission merchant, or broker, may not effect a transaction, purchase, or sale for the account of any customer without specific authorization. *See* 17 CFR § 166.2. A broker's closing out of open positions in a commodity account without a margin call for additional funds constitutes unauthorized trading in violation of § 4b. *See Schultz v. Incomco* [1980–82 Transfer Binder] Comm. Fut.Law Rep. (CCH) ¶ 21.280 [CFTC 1981]. Margin call notice requirements may be altered or waived by contract, however, and this is done typically in customer agreements which authorize the broker to liquidate any customer property in its possession to satisfy account deficiencies whenever an account becomes undermargined. *See Jacobs v. Paine, Webber, Jackson and Curtis Inc.,* [1977–1980 Transfer Binder] Comm.Fut.Law Rep. (CCH) ¶ 20,893, at 23,626 (FCTC 1979); *Chipser v. Kohlmeyer & Co.,* 600 F.2d 1061, 1066–67 (5th Cir.1979).

Liquidation provision in customer agreements have been upheld by the Commodity Futures Trading Commission and the courts where sufficient equality of bargaining power exists, as between a sophisticated, experienced investor and a broker, and where the liquidation provisions are commercially reasonable. *Geldermann & Co., Inc. v. Lane Processing, Inc.,* 527 F.2d 571, 575–76 (8th Cir.1975) The clause at issue in *Geldermann* provided: "In case of my [the customer's] failure to maintain with you [the broker] at all times such margin as you may deem adequate for your protection, you may, without prior demand or notice to me, Sell and/or Purchase such commodities as you may consider necessary to fully protect my account." *Id.* at 574. The *Geldermann* court ruled the liquidation provision was not unconscionable, and upheld its validity on the basis of policy considerations designed to counterbalance the business risks inherent in futures trading:

It is clear that the liquidation provision promoted the interest and protection of the commission merchants, their customers and the investing public as a whole.

Investors or speculators who have failed to deposit sufficient maintenance margins may have insufficient financial resources to withstand substantial losses on the market and, if so, continued trading on that account is a financial risk for the commission merchant, and ultimately for the commodities exchange if the loss suffered by the commission merchant exceeds its capital account.

*Id.* at 577.

██ The liquidation provision in Cauble's customer agreement is strikingly similar to the one upheld in *Geldermann.* It provides:

If at any time Customer's account does not contain the amount of margin required, Broker may, in its sole and absolute discretion, without notice or demand to Customer, close out Customer's open positions in whole or in part or take any other action it deems necessary to satisfy such margin requirements.

Both agreements establish the right to close out the customer's open positions for failure to maintain adequate margin. And since Cauble was a highly sophisticated investor, with ample bargaining power, the liquidation provision in the agreement he signed is commercially reasonable and valid. *See Geldermann,* 527 F.2d at 575–76.

An additional problem exists in this case because the liquidation provision relied upon by Mabon to justify defendants' action and orders appears in the customer agreement between Cauble and Goodman. Cauble argues that Mabon cannot rely on a customer agreement to which Mabon was not a party. It is true that the "broker"— clearly and exclusively identified as Goodman throughout the contract—has the sole right to acquire, manage and dispose of the property in the customer account, including the sole and absolute discretion to establish margin requirements (¶ 2), to liquidate without notice and demand (¶ 3), and to execute trades on any exchange (¶ 10). Nevertheless, defendants assert that Mabon is entitled to enforce the provisions as a third party beneficiary; they claim that the circumstances surrounding the opening of the commodity account and the structure of the trading apparatus set up by Mabon reveal a clear intent by the parties that the customer agreement primarily benefit Mabon.

██ A third party may sue as a beneficiary to a contract if the parties intended their performance to benefit the third party. *Port Chester Electrical Construction Corp. v. Atlas,* 40 N.Y.2d 652, 655, 357 N.E.2d 983, 985–86, 389 N.Y.S.2d 327, 330 (1976). The Restatement Second of Contracts takes the position that, "unless otherwise agreed," if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties," the beneficiary will be protected when "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) of Contracts § 302. The customer agreement does not explicitly grant or deny Mabon a right to enforce any of its terms. The manner in which Cauble's trading account was handled, however, demonstrates that performance of Cauble's contractual obligations under the Goodman customer agreement was to be monitored and controlled by Mabon. At the time of the agreement's execution, Cauble and Goodman were both aware of Mabon's control of the functioning of Cauble's account. Leon Pollack's letter to Cauble on April 20, 1982 delineated the basic terms of the relationship between Cauble and Mabon. Mabon was to have supervisory powers over the Cauble account—including authority to collect margins for Goodman— and to have direct, daily contact with Cauble, while Goodman was to do no more than clear trades. Where performance is to be rendered directly to a third party under the terms of an agreement, that party must be considered an intended beneficiary. *See Goodman-Marks Associates, Inc. v. Westbury Post Associates,* 70 A.D.2d 145, 148, 420 N.Y.S.2d 26, 28–29 (2d Dep't 1979) (per curiam).

██ If Mabon was an intended beneficiary of those terms of the customer agreement governing the management of proper-

ty in the customer account and margin calls, it should also be regarded an intended beneficiary of the liquidation provision. Goodman, in relying on Mabon for collecting margin payments, had a clear interest in providing Mabon with the power to make margin calls on Cauble and to otherwise determine whether any shortfall in margin payments merited liquidation. Mabon's interest in having the power to liquidate is even more obvious; any loss due to delayed liquidation of Cauble's account might well have ultimately fallen on Mabon, because of its separate obligations to Goodman. In light of Mabon's central position in the Cauble/Mabon/Goodman relationship, Mabon should be recognized as a third party beneficiary of Goodman's customer agreement, including the right to liquidate Cauble's account, without demand or notice, for failure to maintain adequate margin. *See Okcuoglu v. Hess, Grant & Co., Inc.,* 580 F.Supp. 749, 751–52 (E.D.Pa.1984) (broker managing account may rely on arbitration clause in customer's agreement with clearing house).

■ Though Mabon is entitled to rely on the Goodman customer agreement, the agreement itself is ambiguous as to whether the broker has absolute authority to liquidate. All transactions are subject to the rules of the exchanges on which trades are executed; Rule 209 of the Chicago Board of Trade requires a margin call and reasonable time thereafter before liquidation of undermargined accounts. *Dean Witter & Co., Inc. v. Tiger Tail Farms, Inc.,* [1980–1982 Transfer Binder] Comm. Fut.Rep. (CCH) ¶ 21,352 at 25,664 to 25,666 (Tenn.Ct.App.1982). Moreover, where a customer agreement is in effect, the broker does not have unbridled discretion to liquidate an account; its power to liquidate must be exercised in good faith under the existing facts and circumstances. *See Selvig v. Shearson Hayden Stone, Inc.,* [1980–1982 Transfer Binder] Comm. Fut.Law Rep. (CCH) ¶ 21,150, at 24,711 (CFTC 1981). Cauble claims no margin call was ever made in this case, that he traded down on July 7, 1982 to what was agreed with Joe Belanoff as zero margin, and that

at no time was he asked to post additional margin. The Mabon partners and Joe Belanoff claim that Cauble refused to post additional funds after a request to do so.

■ In view of the evidence presented on this issue, summary judgment for the defendants would be inappropriate on Count One of the complaint, since material issues of fact remain in dispute. Mabon may rely on the terms of the Goodman customer agreement. Whether the agreement justified liquidation, however, depends upon the circumstances, which are in material dispute. *See Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir.1975) (summary judgment improper where contractual language is susceptible of two reasonable interpretations). Whether Mabon made a margin call and then acted reasonably in light of the circumstances is a question for the jury.

■ In his second and third causes of action for negligence and gross negligence, plaintiff asserts that defendants Mabon and Jeffrey Pollack breached the duty owed by a broker to his customer under state law by closing out his account without authorization or notice. Defendants seek to dismiss these claims on the grounds that Mabon had no duty either to continue trading in or to maintain Cauble's undermargined account according to the provisions of the Goodman customer agreement. Under New York law, however, Mabon, as Cauble's broker and agent, had a fiduciary duty to use reasonable efforts to give its principal information relevant to affairs Cauble had entrusted to the broker. *See Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937, 946–47 (S.D.N.Y.1979). Cauble has alleged and sworn that Mabon reassured Cauble on July 7 and 8 that his account would not be liquidated and that Mabon, in fact, continued executing orders on July 8 after claiming that they would accept only offsetting trades. Furthermore, some evidence exists that Jeffrey Pollack and John Friel, with whom Cauble had previously refused to trade, deliberate-

ly undermined the Cauble/Mabon course of trading by arranging to liquidate at a time when none of the regular Mabon contacts upon whom Cauble relied would be available to countermand their plan. Leon Pollack was on vacation and Joe Belanoff was ordered to stay home, allegedly as part of a plan to deceive Cauble about the firm's determination to refuse trades.

Defendants further contend that the claims based on gradations of allegedly negligent conduct provide no separate ground for relief. Under New York law, however, gross negligence is a tort differing from ordinary negligence in kind rather than degree. Gross negligence implies willful or intentional misconduct. It is defined as the thoughtless disregard of consequences which may ensue from an act, and an indifference to the rights of others. Unlike the failure to use ordinary and reasonable care in simple negligence, gross negligence justifies the imposition of liability and damages, even when the parties have provided in a contract against liability. *See Hong Kong Export Credit Ins. Corp. v. Dun and Bradstreet*, 414 F.Supp. 153, 160 (S.D.N.Y.1975); *Denmark v. New York Telephone Co.*, 97 Misc.2d 205, 411 N.Y.S.2d 506 (Civ.Ct., Kings Cty. 1978). The proof offered on this motion thus requires a trial on both the negligence claims. *Sadowy v. Sony Corp.*, 496 F.Supp. 1071, 1076 (S.D.N.Y.1980).

II. *Claims Relating to the Settlement.*

Cauble's fraudulent inducement claim under state law asserts that Mabon deceived Cauble into making a $175,785.00 payment on the account deficit by promising special releases which Mabon never tendered. Under New York law the essential elements of a cause of action for fraudulent inducement in the making of an agreement are (1) representation of a material fact, (2) falsity of that representation, (3) scienter, (4) reliance, and (5) damages. *Newman v. Silver*, 553 F.Supp. 485, 497 (S.D.N.Y.1982) *modified on other grounds*, 713 F.2d 14 (2d Cir.1983); *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.

S.2d 186, 193 (2d Dep't 1980). The action cannot be predicated solely upon promissory statements relating to future acts which constitute the contractual obligations themselves; the failure to perform such promises of future acts is actionable in a suit for breach of contract, not fraud. *Robbins v. Ogden Corp.*, 490 F.Supp. 801, 809 (S.D.N.Y.1980); *Wegman v. Dairylea Cooperative, Inc.*, 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 734–35 (4th Dep't 1975). But one who makes a contractual promise with the undisclosed intention to breach it can be held liable for fraud. *Sherkate Sahami Khass Rapol v. Henry R. Jahn and Son, Inc.*, 531 F.Supp. 1048, 1061 (S.D.N.Y.1982), *modified on other grounds*, 701 F.2d 1049 (2d Cir.1983). Proof of such intention, however, must be based on more than a mere showing of nonperformance. *DiRose v. Pk Management Corp.*, 691 F.2d 628, 632–33 (2d Cir.1982), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983).

The record in this case indicates that something more than a dispute or misunderstanding about the terms and form of the release prevented completion of the August 3 agreement. Cauble expected a near simultaneous exchange—a payment from Cauble that would release all obligations to Mabon sent by Federal Express to arrive on August 4 for a release or letter stating the circumstances of the account closing signed by Mabon partners to be discussed by phone on August 4 and sent by the same means on August 5. Plaintiff's Exhibit C. Mabon failed to respond until August 10, after Cauble's check had been deposited and cleared, and then Mabon merely sent standard releases. Despite Leon Pollack's earlier recorded reassurances, his letter to Cauble dated August 25 flatly states "the letter obviously was not to be an admission that we had done anything incorrectly." Pollack Affidavit Ex. F. In addition, Leon Pollack knew during the negotiations that Belanoff was ordered to remain at home so that he could not execute any further trades in the Cauble account, and that Belanoff knew of the Mabon partners' decision to refuse Cau-

ble's trades on July 7. These facts and contentions constitute sufficient evidence, beyond mere nonperformance of the promise, that Mabon intended to breach its promises to Cauble when they were made, so that summary judgment for the defendants on this count is inappropriate.

■ The plaintiff's claim for fraudulent inducement based on the same facts under section 4b of the CEA, however, must be dismissed; the scope of section 4b does not encompass settlement negotiations undertaken after an account is closed. By its express language section 4b prohibits fraudulent conduct on the part of brokers, their agents, and employees in connection with the taking of orders or the disposition of commodity contracts:

> It shall be unlawful ... for any member of a contract market in or in connection with any order to make, or the making of, any contract of sale ... made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ... to cheat or defraud ... such other person....

7 U.S.C. § 6b (1982).

■ The broad range of customer transactions covered by the statute includes unauthorized trading in an account, *Haltmier v. Commodity Futures Trading Commission*, 554 F.2d 556 (2d Cir.1977), misrepresentations made to induce transactions in an account, *In the Matter of Clancy* [1977–1980 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 20,905, at 23,675 (1979), misrepresentations made prior to liquidation, *Chipser*, 600 F.2d at 1068, and by extension fraudulent solicitations relating to the opening of an account, *Hirk v. Agri Research Council, Inc.*, 561 F.2d 96, 103–04 (7th Cir.1977). By contrast, however, the disputed negotiations concerning Cauble's deficit payment and the releases, occurring after all trading had terminated, was not conduct "in connection" with contract trading although it arose out of trading activity. The distinction may be illustrated by contrasting the narrow language of § 4b of the CEA with the broad definition of "claim or grievance" in the regulation promulgated under the arbitration provision of the CEA, 7 U.S.C. § 7a(11): "The term 'claim or grievance' as used in this part shall mean any dispute which arises out of any transaction on or subject to the rules of the contract market executed by or effected through a member of that contract market...." 17 CFR § 180.1. Accordingly, Court Six—the fraudulent inducement claim under the CEA—is dismissed.

■ Defendants assert that plaintiff has no implied right of action under the CEA for aiding and abetting based on a 1983 amendment to 7 U.S.C. § 13c which expressly provides that those who intentionally assist others in violating the CEA can be held responsible as principals. Defendants contend that, before the enactment of the 1983 amendment to § 13c, aiders and abettors could be held responsible only in administrative proceedings and that, since plaintiff began this action prior to 1983, no private right of action existed. Even before 1983, however, a private right of action for damages against violators had been generally, though not uniformly, recognized in federal courts under the aiding and abetting section. *See Arnold v. Bache & Co., Inc.*, 377 F.Supp. 61, 65 (M.D.Pa. 1973); *Barlas v. Munir*, [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,-224 at 25,109 (E.D.N.Y.1981). *But see Strax v. Commodity Exchange, Inc.*, 524 F.Supp. 936, 944 (S.D.N.Y.1981). Following the Supreme Court's resolution of the issue in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 388, 102 S.Ct. 1825, 1844, 72 L.Ed.2d 182 (1982) (private cause of action under the CEA survived the 1974 amendments), Congress amended the statute by eliminating the restrictive language of section 13. The amendment was intended to ensure consistent treatment of aiders and abettors in both an administrative forum and before the courts, not to create a new cause of action for enforcement of the Act's provisions. *See* H.R.Rep. No. 565, Part I, 97th Cong. 2nd Sess. 4, *reprinted* in 1982 U.S. Code Cong. & AD News 3871, 3902. The legislative history and case law reveal,

however, that the purpose of the provision was to allow the Commodity Futures Trading Commission and the courts to reach those who instigated, controlled, or supervised violations of the Act but who were shielded by legal entities of corporations or partnerships. H.R.Rep. *supra* at 3902; *In the Matter of International Commodity Options Ltd.*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. ¶ 20,876, at 23,575 (CFTC 1979); *In the Matter of Taylor Commodity Corp.* [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,037, at 24,096 (CFTC 1980). Mabon and its general partners, Leon and Jeffrey Pollack, are already charged as principals in this action on the same facts in Counts One and Six under the CEA. In addition, Mabon is a partnership organized in accordance with New York law under which all partners and the partnership are jointly and severally liable for the wrongful acts of a partner or employee acting in the ordinary course of the partnership's business. *See* Partnership Law § 24–26 (McKinney 1982). Absent any allegation or evidence that an entity or individual acting outside the scope of the Mabon partnership was induced or controlled by Mabon to violate the CEA by liquidating the Cauble account or negotiating payment, Counts Four and Seven under section 13c of the CEA are duplicative and are therefore dismissed.

### III. *Interference with Business Dealings.*

Cauble alleges in Count Eight that Mabon interfered with his business dealings with Miller, Tabak and Hirsch, and with Bear Stearns & Co., by circulating a highly prejudicial report about him throughout the industry. The evidence presented by the plaintiff in response to the defendants' motion for summary judgment on this charge is an unauthenticated tape transcript of a conversation between Alan Harp and Dennis Gartman, then a broker with A.G. Becker, indicating that Gartman had seen such a report in the files of his firm.

■■■■■ Because the transcript relied on here is unauthenticated, it is inadmissible.

(A recorded telephone conversation is admissible in evidence at trial only if the identity of the speaker is satisfactorily established.) *See United States v. Albergo*, 539 F.2d 860, 863–64 (2d Cir.1976), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976); *United States v. McKeever*, 169 F.Supp. 426, 429–31 (S.D.N.Y.1958). No admissible evidence having been presented to create any genuine dispute of material fact, summary judgment for the defendants on this count is granted.

### IV. *Alleged Conversion.*

■■■■ Cauble alleges in Count Nine that Mabon's deposit and retention of his check for $174,785.00 in settlement of the deficit in his accounts constitutes a conversion of those funds, since Mabon liquidated his account without notice or authorization. When stocks carried on margin or commodities contracts are unlawfully sold without notice, the broker is liable for conversion and the customer is entitled to damages based on the higher of either (1) the value of the contracts at the time of liquidation, or (2) the highest intermediate value between notice of the conversion and a reasonable time thereafter during which the contracts could have been replaced had that been desired. *See Mayer v. Monzo*, 221 N.Y. 442, 446, 117 N.E. 948, 950 (1917); *Schultz v. Commodity Futures Trading Commission*, 716 F.2d 136, 140–41 (2d Cir. 1983). Thus the deficit, representing the loss realized by the sale of unprofitable contracts, might have been offset, as Cauble asserts, by potential profits lost as a result of Mabon's wrongful liquidation at an unfavorable time.

■■■■■ Nevertheless, Mabon's retention of the $175,785.00 does not constitute conversion of funds from wrongfully sold contracts within the meaning of *Monzo* and *Schultz*. Conversion of property is an unauthorized exercise of dominion or control over property by one who is not its owner which interferes with another person's superior possessory rights. *United States v. Paladin*, 539 F.Supp. 100, 103 (W.D.N.Y. 1982); *Meese v. Miller*, 79 A.D.2d 237, 242,

436 N.Y.S.2d 496, 500 (4th Dep't 1981). In this case Cauble sent the check after extended negotiations at arm's length with Leon Pollack over the valuation of the contracts and mutual releases. The sum included $69,000 indisputably owed Mabon on the Fern Lynch and Lewis Cauble accounts, both of which were closed with Cauble's authorization. It also included $106,000 ($56,000 less than the deficit figure Mabon claimed), representing the amount Cauble acknowledged at the time was due Mabon based on a valuation of both the treasury bond contracts, following Mabon's usual method of determining daily deficits, and silver contracts valued at the time of sale. By his actions acknowledging the deficit, negotiating the amount, and conveying the check, Cauble indicated that Mabon had a right to possession of the check. *See Silver*, 553 F.Supp. at 498 (negotiated lawyer's fees willingly turned over held not to be converted even though later established by the court as excessive). Moreover, subsequent disagreements with Mabon resulting in Cauble's demand for the return of the check concerned the form of the releases and the alleged breach of the exchange agreement, not a repudiation of the deficit in the amount of $174,785.00 previously acknowledged by Cauble.

Therefore, defendants' motion for summary judgment is granted on Counts Four and Seven for aiding and abetting under § 13 of the CEA, Count Six for fraudulent inducement under § 4b of the CEA, Count Eight for tortious interference with Cauble's business relations with Bear Stearns & Co. and Miller Tabak & Hirsch, and Count Nine for conversion of the $174,-785.00 check under state law. F.R.C.P. 56. Defendants' motion for summary judgment is denied with respect to Count One for fraudulent trading under § 4b of the CEA in the liquidation of the Cauble account, Counts Two and Three for negligence and gross negligence arising from the unauthorized liquidation under state law, and Count Six for fraudulent inducement under state law stemming from the settlement agreement.

### V. *Potential Damages.*

Even if the plaintiff can prevail on the remaining counts, the measure of damages in a case of wrongful liquidation is a matter of law and the appropriate measure will be the difference between the liquidation prices of the contracts and the "highest intermediate prices reached by the identical contracts during a reasonable period after the wrongful sale." *Letson v. Dean Witter Reynolds, Inc.*, 532 F.Supp. 500, 503 (N.D.Cal.1982), *aff'd, Shearson Loeb Rhoades, Inc. v. Bryant*, 730 F.2d 769 (9th Cir.1984).

Cauble contends that a reasonable period to determine damages caused by Mabon's liquidation is the time between July 8, when Mabon closed his account, and August 26, when he was able to open a new account. Cauble's calculation of lost profits during that period amounts to $352,000.00. Cauble claims that his criminal conviction made it difficult to establish a new account relationship, a difficulty he claims was foreseeable by Mabon, and thereby implies that Mabon's liquidation was the proximate cause of Cauble's inability to open a new account until August 26. Mabon's liquidation certainly forced Cauble to establish a new account with another broker if he wanted to continue trading, but this cannot be considered the proximate cause of his inability to do so until August 26. The only other account he opened was on solicitations by his Mabon broker, Belanoff. And although Cauble asserts that he attempted to open other accounts, *see* Cauble Depo. Tr. at 128, 141–42, 165, the record is devoid of concrete evidence to support his claim. If anything made it difficult for Cauble to open a new account, it was his criminal conviction. Cauble has thus far presented no admissible evidence that Mabon tortiously interfered with his prospective business relations. Absent such evidence, and considering Cauble's experience and capabilities as a trader and his immense wealth, a reasonable period to use to determine damages would be two trading days. *See Letson*, 532 F.Supp. at 504.

Cauble's claim for $793,750.00 in damages for orders for Treasury Bond contracts which Mabon refused to place is similarly unfounded. The cases cited in Plaintiff's Memorandum of Law in Response to Order Dated June 13, 1984 Requesting Briefing on Certain Issues involved transactions that were never actually executed by the broker, who nevertheless represented to the trader that they were in fact completed or were in the process of being completed. In this case, Mabon refused to accept the purchase order. The measure of damages, if any, will be the difference between the price at which the order should have been executed and the price at which the customer could subsequently have executed the order within the next two trading days. *See Parman v. London Commodity Options, Ltd. et al* [1977–80] Comm. Futures Law Rep. ¶ 20,804 at 23,274 (C.F.T.C.1979).

If defendants are prepared to pay the damages resulting from this analysis, even though they claim no liability, the Court will enter an appropriate judgment for the amounts involved and a trial on the open claims can be avoided. Meanwhile, judgment will be entered dismissing Counts Four, Six, Seven, Eight, and Nine. FRCP 56.

SO ORDERED.