[No. G004537. Fourth Dist., Div. Three. Oct. 30, 1987.]

MARGARET VAN LUVEN, Plaintiff and Respondent, v. ROONEY PACE, INC., Defendant and Appellant.

---

COUNSEL

Hughes, Hubbard & Reed, William T. Bisset and Charles Avrith for Defendant and·Appellant.

Coulombe & Spiszman and Ronald B. Coulombe for Plaintiff and Respondent.

---

OPINION

**CROSBY, J.**—This is yet another in a seemingly endless stream of cases involving brokerage houses and arbitration agreements. On the record presented here, we hold the successor of a nonsignatory to a contract containing an arbitration provision cannot require a signatory to arbitrate.

## I

### A

Margaret Van Luven's complaint recounts the following: Account executive Steven Sullivan, employed by the Newport Beach office of now defunct J. David Securities, commenced supervision of her securities trading accounts in 1980. When Van Luven, then age 76, entered Hemet Valley Hospital in March 1983, she telephoned Sullivan and requested him to hold all her securities for "safekeeping."

In February 1984, shortly after J. David's demise, Sullivan joined Rooney Pace and transferred Van Luven's accounts to that firm. Before and after

Sullivan's change of employment, he frequently sold blocks of Van Luven's stock and redeemed bonds and bond interest coupons, placing the proceeds in the account of a dummy corporation appropriately yclept "Liberty Street Securities." Sullivan forged Van Luven's signature on a general power of attorney and several other documents to facilitate these schemes and even pledged her assets as collateral to secure his own personal loans.

Van Luven occasionally received small payments from Sullivan on an "as needed" basis, along with monthly computerized statements misrepresenting the actual value of her stock portfolio. Suspicious of Sullivan's conduct, Van Luven demanded the return of her securities on several occasions in late 1985. Sullivan refused, sending Van Luven a rambling letter protesting his legal and spiritual innocence.

### B

Unconvinced, Van Luven sued Rooney Pace for damages incurred as a result of the unauthorized securities transactions, alleging the facts recounted above. Rooney Pace sought an order compelling arbitration of the action. Its petition was based on an arbitration agreement purportedly signed by Van Luven in February 1983, when her account was still with J. David, who functioned as an "introducing broker." The only parties to the agreement, however, were Van Luven and Bear Stearns & Co., the "clearing broker" for her account and not a party to this action. In industry parlance, an introducing broker is the firm whose account executives deal with customers, i.e., solicit orders and offer recommendations. A clearing broker, on the other hand, has no client contact, but places and executes orders with the exchange at the direction of the introducing broker.

In support of the petition, Rooney Pace's general counsel, Arnold Weinberg, provided a declaration which expanded on the dual broker concept and included the following details: "Since Bear Stearns is the broker which actually executes or 'clears' a client's trades, when a client opens an account with Rooney Pace, a Rooney Pace representative will request that the client execute a Bear Stearn's standard Customer's Agreement for Cash And/Or Margin Accounts (the 'Customer's Agreement'). The client does not execute any further written agreement with Rooney Pace as introducing broker, and the terms of the Customer's Agreement governs [sic] the relationship between Rooney Pace and the client. Rooney Pace has the contact with the client, and Bear Stearns relies on Rooney Pace to supervise the client's account and to ensure compliance with the Customer's Agreement.

"

"[ ] Since Bear Stearns was Rooney Pace's clearing broker, it was not necessary for her to execute a new Customer's Agreement when she transferred her account to Rooney Pace. Rooney Pace's records indicate that all transactions in her account at Rooney Pace were cleared by Bear Stearns pursuant to her Customer's Agreement."

Taking a somewhat inconsistent position, Sullivan, the defendant broker, also submitted a declaration in which he was at pains to establish that Van Luven *orally* agreed the Bear Stearns agreement would "govern" her relationship with Rooney Pace: "I explained to [Van Luven] that Rooney Pace used the same clearing broker (Bear Stearns) as J. David and that accordingly the Bear Stearns' Customer's Agreement that she had signed when her account was with J. David would continue to govern her account with Rooney Pace. She told me that this was acceptable to her."

Van Luven disputed the authenticity of this agreement in the trial court: By the time Rooney Pace petitioned to compel arbitration, however, the original had been destroyed; and only the first and last pages were retained on microfilm. A copy of what Rooney Pace alleged was the balance of the agreement was attached to its moving papers.

Nevertheless, in the trial court Van Luven conceded for the sake of argument that she did sign a standard Bear Stearns agreement in 1983 and attacked the petition on its merits: She had no contract with Rooney Pace to arbitrate; and that entity could not, she countered, avail itself of her agreement with Bear Stearns. Van Luven relied on the agreement itself to support her position and submitted no declaration concerning her understanding of its terms.

The Bear Stearns contract is straightforward, as far as agreements of this sort go; and it is fairly colloquial in form, i.e., the legalese has been kept to a minimum. It begins, "I agree to the following with respect to my account(s) with Bear, Stearns & Co., its successors or assigns for the purchase and sale of securities and commodities." It is apparent from the language in paragraph 6 that a significant purpose of the agreement is to protect the clearing broker from liability for the acts or omissions of the introducing broker: "If you[, i.e., Bear Stearns] are carrying the account of the undersigned as clearing broker by arrangement with another broker through whose courtesy the account of the undersigned has been introduced, then until receipt from the undersigned of written notice to the contrary, you may accept from such other broker, without inquiry or investigation by you, (i) orders for the purchase or sale [ ] of securities . . . . *It is understood that you shall not be responsible or liable to the undersigned for any acts or omissions of such other broker or its employees.*" (Italics added.)

The arbitration clause follows in paragraph 9: "Any controversy arising out of or relating to my cash and/or margin accounts to [*sic*] transactions with you for me or this agreement or the breach thereof shall be settled by arbitration . . . . It is understood that this agreement to arbitrate does not constitute a waiver of the right to a judicial forum where such waiver would be void under the securities laws and specifically does not prohibit me from pursuing any claim or claims arising under the federal securities laws in any court of competent jurisdiction."

Finding no "mutual assent to arbitrate as between plaintiff and defendant Rooney, Pace Inc.," the superior court denied the petition. In the statement of decision, the court added, "The agreement itself contains no language from which it could be concluded that plaintiff agreed to arbitrate with anyone other than Bear Stearns . . . ." Finally, citing *Ahn* v. *Rooney, Pace Inc.* (S.D.N.Y 1985) 624 F.Supp. 368, the court specifically rejected Rooney Pace's claim that it was a third party beneficiary of the agreement with Bear Stearns.

## II

The issue before us is simply stated: May the successor to the introducing broker enforce this particular arbitration agreement between its customer and a clearing broker? Rooney Pace claims federal law so requires. We are not persuaded.

The Federal Arbitration Act (9 U.S.C. § 1 et seq.) applies to all written contracts which contain arbitration provisions and involve interstate commerce. (Cf. Code Civ. Proc., § 1281.2.) The act reflects a liberal federal policy favoring arbitration and, where applicable, preempts California law governing the validity of an arbitration clause. (*Perry* v. *Thomas* (1987) 482 U.S. 483 [96 L.Ed.2d 426, 107 S.Ct. 2520]; *Tonetti* v. *Shirley* (1985) 173 Cal.App.3d 1144, 1147 [219 Cal.Rptr. 616].)

With respect to introducing brokers seeking to piggy-back onto clearing brokers' customer agreements, two lines of federal authority have developed. One line is represented by the case the trial court cited, *Ahn* v. *Rooney, Pace Inc., supra,* 624 F.Supp. 368. Under facts very similar to ours, the district court rejected the introducing broker's claims that it was either an agent of the clearing broker or a third party beneficiary of the contract between the clearing broker and customer.

On the first point, the judge in *Ahn* observed, "There has been no evidence that Bear Stearns and defendant Rooney, Pace are anything other than entirely independent entities. Indeed, Bear Stearns has underscored its

separateness from Rooney, Pace by expressly disavowing in its customer agreement any responsibility or liability for the acts of the introducing broker. Because, therefore, the requisite elements both of consent by the principal that the other party act on its behalf, and of retained control by the principal are missing from the Bear Stearns/Rooney, Pace relationship, clearly [ ] it may not be understood as one of agent and principal." (*Id.,* at p. 371.)

While acknowledging that "small broker[s]" like Rooney Pace "[o]bviously" benefit from the clearing broker arrangement, the court determined there was no evidence that the customer and clearing broker intended, by the act of signing the agreement, to confer a benefit on the introducing broker. (*Ibid.*) Thus, concluded the court, with no more than an incidental relationship to the bargain, the introducing broker simply had no standing to enforce the arbitration clause. (See also *Mowbray* v. *Moseley, Hallgarten, Estabrook & Weeden.* (1st Cir. 1986) 795 F.2d 1111.)

Several other courts *have* permitted introducing brokers to enforce arbitration agreements between customers and clearing brokers, either on the theory that the introducing broker was a *disclosed* agent of the clearing broker (*Okcuoglu* v. *Hess, Grant & Co.* (E.D.Pa. 1984) 580 F.Supp. 749) or a third party beneficiary of the clearing broker's contract (*Nesslage* v. *York Securities, Inc.* (8th Cir. 1987) 823 F.2d 231). But these cases are distinguishable.[1]

The plaintiff in *Okcuoglu* was an active margin account customer whose stock was liquidated to meet a margin call. Both the clearing and introducing brokers were involved in the liquidation decision; and the court noted the clearing broker, who the parties conceded had the right to enforce arbitration of the dispute, might yet be brought into the fray as a necessary party. (*Okcuoglu* v. *Hess, Grant & Co., Inc., supra,* 580 F.Supp. at p. 751.) Moreover, based on the parties' conduct over a five-year period of option trading, the court determined the introducing broker was an agent of *both* the customer and the clearing broker.

In *Nesslage,* the court concluded without any discussion that the introducing brokerage firm "was the disclosed agent of" the clearing broker

---

[1] This matter does contain one additional feature not present in any case we have examined: Here the introducing broker seeking to enforce the clearing broker's arbitration agreement is the successor to the broker who actually handled the account when the customer signed the contract. Thus, Rooney Pace is twice removed from this agreement and arguably for that reason alone could not prevail under the second line of authority, Van Luven's alleged oral acquiescence to keep the same agreement in effect notwithstanding. The Federal Arbitration Act does not apply to oral agreements to arbitrate. (9 U.S.C. § 2.)

whose agreement with the customer included an arbitration provision; and, consequently, the firm and its broker were third party beneficiaries of the clearing house contract. (*Nesslage* v. *York Securities, Inc., supra,* 823 F.2d at p. 233.) The court relied on *Okcuoglu,* although that decision was not grounded on a third party beneficiary theory.

*Nesslage* also cited *Cauble* v. *Mabon Nugent & Co.* (S.D.N.Y. 1984) 594 F.Supp. 985, but *Cauble* did not even involve a petition to arbitrate. Cauble was a sophisticated commodities and futures investor. In a detailed letter, the introducing broker explained it was not a "clearing member" on the Chicago Board of Trade and all transactions would be executed by a clearing broker who would confirm all trades directly with Cauble. The only customer agreement signed by Cauble was furnished by the clearing broker, and it authorized the broker to liquidate without notice a customer's account in order to satisfy a margin deficit. Over the next several months Cauble communicated every day with the introducing broker and received daily statements of his transactions from the clearing broker. When Cauble failed to timely satisfy a shortfall in his margin account, the *introducing* broker ordered the sale of all his property in its possession.

Cauble sued; and the introducing broker moved for summary judgment, claiming to be a third party beneficiary of the liquidation provision in the clearing broker's agreement. Based on the undisputed understanding of the parties when the account was opened and the manner in which the parties dealt with one another, the federal district court agreed the introducing broker was intended by the parties to be a beneficiary of the clearing broker's agreement and was thus entitled to enforce the liquidation agreement.

These facts stand in stark contrast to Van Luven's situation; and, in our view, the results in *Nesslage, Okcuoglu,* and *Cauble* were never intended to apply to cases like this one. Van Luven has not been characterized as a sophisticated investor and did not operate a margin or option account. There is no evidence she ever had any contact with Bear Stearns. She merely had a cash account where the introducing broker was given the authority to make transactions without her approval.

Moreover, the literal language of the present agreement amply demonstrates it was only intended to govern the relationship between Bear Stearns and Van Luven; it hardly could have alerted Van Luven to anticipate otherwise. And there was no evidence that the relationship between Bear Stearns and Rooney Pace was other than one between two completely independent entities. Accordingly, under these circumstances, we conclude that an introducing broker who fails to obtain its own written customer agreement cannot enforce that of a broker operating in a completely

different capacity who does—especially where, as here, the introducing broker's relationship with the plaintiff did not even exist at the time the agreement was executed.[2]

Judgment affirmed. Respondent is entitled to costs on appeal.

Wallin, Acting P. J., and Taylor, J.,* concurred.

---

[2] Upon a showing of third party beneficiary status, agency relationship, broader language in the arbitration clause, or some other appropriate evidence, an introducing broker might be able to enforce an arbitration agreement between a customer and clearing broker, we suppose. None of these features is present here.

* Assigned by the Chairperson of the Judicial Council.