**Cornelius WILSON, Plaintiff,**

v.

**D.H. BLAIR & COMPANY, INC., et al., Defendants.**

No. S88–537.

United States District Court, N.D. Indiana, South Bend Division.

Jan. 23, 1990.

James B. Koch, Chicago, Ill., E. Spencer Walton, Jr., South Bend, Ind., and Richard J. Morvillo, Washington, D.C., for plaintiff.

James H. Ham, III and Douglas D. Powers, Fort Wayne, Ind., for defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause comes before the court on plaintiff Cornelius Wilson's motion to vacate this court's order of December 9, 1988 staying further proceedings pending arbitration of the claims raised in the plaintiff's complaint. Mr. Wilson first asked the court to reconsider the December 9 order because the factual record on that date was incomplete. At the time of the court's ruling, Mr. Wilson had not filed a response to the defendants' motion to stay. The court granted Mr. Wilson's motion to reconsider its December 9 ruling on July 5, 1989. Defendants D.H. Blair & Company ("Blair") and Mr. Howard Rubin object to Mr. Wilson's motion to vacate arguing that the order staying the proceedings was proper and that further reconsideration of the issue is now untimely. Both parties have filed several memoranda and supplemental authorities in support of their position. This matter is now ripe for ruling.

Mr. Wilson's complaint lists seven counts against the defendants for violation of federal racketeering statutes, the Securities Exchange Act of 1934, rules of the New York Stock Exchange and the National Association of Securities Dealers, and for acts of fraudulent inducement and misrepresentation, conversion, and breach of a fiduci-

ary duty. Mr. Wilson sues Blair and Mr. Rubin; Prudential–Bache Securities, Inc. ("Prudential–Bache,"), the clearing broker for Blair, is not a party to this action. Mr. Wilson claims losses exceeding $400,000.00 in actual damages on each of the counts and further asks for an assessment of $10,-000.00 in punitive damages. The defendants deny the allegations.

The facts giving rise to the action involve Mr. Wilson's dealings with the securities brokerage firm (Blair) and one of Blair's sales representatives (Mr. Rubin). From October, 1986 to November, 1987, Mr. Wilson had a cash account at Blair, with Mr. Rubin acting as his account executive. Mr. Wilson characterizes himself as an "inexperienced investor", who had "previously engaged in a few isolated securities transactions", wishing to invest only in "low-risk stocks on a cash basis". The pleadings indicate that Blair secured this account through Mr. Rubin's telephone and mail solicitation of Mr. Wilson. (Declaration of Cornelius Wilson, ¶¶ 3–6, 13, and 14).

On April 7, 1987, Mr. Wilson signed a client's agreement presented to him by Mr. Rubin. This document represents the central point of the parties' controversy on the issue of arbitration. The agreement does not list Blair's name, but rather Prudential–Bache, the clearing firm associated with Blair. Cornelius Wilson's name and an account number[1], however, appear on the client's agreement, as do the following provisions:

> 14. It is understood that the following agreement to arbitrate does not constitute a waiver of the right to seek a judicial forum where such a waiver would be void under federal securities laws.
>
> The undersigned agrees, and by carrying an account for the undersigned you agree, that except as inconsistent with the foregoing sentence, all controversies which may arise between us concerning any transaction or the construction, performance or breach of this or any other

---

1. The court assumes this number reflects Mr. Wilson's account with Blair; however, the present record offers no confirmation of this assumption.

agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration.

15. This contract shall be governed by the laws of the State of New York, and shall inure to the benefit of your successors and assigns, and shall be binding on the undersigned, my heirs, executors, administrators and assigns. Any controversy arising out of or relating to my account, to transactions with or for me or to this Agreement or the breach thereof, and whether executed or to be executed within oɪ ɔutside of the United States, and any controversy arising out of or relating to transactions in commodities or contracts related thereto executed on or subject to the rules of a contract market designated as such under the Commodity Exchange Act, as amended, shall be settled by arbitration in accordance with the rules then obtaining of either the NASD, AMEX or the Board of Governors of the New York Stock Exchange as I may elect. If I do not make such election by registered mail addressed to you at your main office within five (5) days after demand by you that I make such election, then you may make such election. Notice preliminary to, in conjunction with, or incident to such arbitration proceeding, may be sent to me by mail and personal service is hereby waived. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof, without notice to me.

(Howard Rubin Aff., Exh. 2).

The existence and nature of the relationship between Blair and Prudential–Bache is customarily revealed to a client (such as Mr. Wilson) through an introductory letter provided to the client upon opening an account with Blair. (Rubin Aff., Exh. 1). Mr. Wilson says he never received such a letter and was unaware of any association between the two firms prior to Mr. Rubin's efforts to acquire a signature on the client's agreement. (Wilson Declaration, ¶¶ 8 and 9). While Mr. Rubin's affidavit recites the customary procedure, he is uncertain whether a delivery of that letter was made to Mr. Wilson upon opening of an account with Blair. (Rubin Aff., ¶ 4). Mr. Wilson indicates that Mr. Rubin told him that the client's agreement did not affect his relationship with Blair or his account and that it was only a formality necessary for Prudential–Bache to perform certain administrative functions.

The defendants assert that the provisions quoted above mandate arbitration over Mr. Wilson's claims. The defendants give two alternative arguments[2] in support of this position: (1) Blair was a party to the client's agreement signed by Mr. Wilson and is, therefore, entitled to enforce that contract and those provisions for arbitration contained within; and/or (2) Blair was a third-party beneficiary of the contract between Mr. Wilson and Prudential–Bache and as such is entitled to any rights or privileges that stem from that contract. Mr. Wilson finds fallacy in each of these analyses. Mr. Wilson admits that the client's agreement constitutes a contract between Mr. Wilson and Prudential–Bache, but argues that Blair is neither a party to nor a beneficiary of that agreement. The court finds Mr. Wilson's legal interpretation of the agreement and the parties' (and non-party's) relationship the more plausible.

The few courts that have addressed the issue in question have permitted introducing brokers to enforce arbitration agreements between clients and clearing brokers in one of two instances. In the first instance, the introducing agent is a disclosed agent of the clearing broker. In *Okcuoglu v. Hess, Grant & Co.*, 580 F.Supp. 749 (E.D.Pa.1984), the introducing broker worked as a go-between for the customer

---

**2.** The defendants also refer the court to *Gray v. D.H. Blair*, Index No. 6250/87 (N.Y.Sup.Ct., July, 1987), a case in which the defendants allege the same arbitration clause (present in Mr. Wilson's agreement) in a contract between a client and Prudential–Bache was applied to a dispute between that client and Blair. Unfortunately, that decision does not discuss the facts of the case and, accordingly, this court is unable to determine if similar circumstances exist in the case at bar.

and the clearing broker for a five-year period. Based on that fact and the obvious disclosure to the client of the clearing broker's existence and function, the introductory broker was permitted, as an agent of both parties, to enforce the arbitration clause of the customer's contract with the clearing broker. 580 F.Supp. at 751.

The facts in this case differ greatly from those in *Okcuoglu*. Here, there is no evidence that Mr. Wilson was even aware of the existence of Prudential–Bache as a clearing broker until he was provided with the client's agreement. If an agency relationship existed between the two brokers, Blair has failed to prove disclosure of that fact to Mr. Wilson.[3] Moreover, the contract in *Okcuoglu* included a clause providing protection for the clearing brokers' agents and corresponding firms; no such clause appears in the client's agreement signed by Mr. Wilson.

By contrast, in *Finlay v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, No. 85–C–7205, 1987 WL 5237 (N.D.Ill. January 5, 1987) (LEXIS, Genfed library, Dist file), the court refused to allow an introductory broker to enforce the arbitration clause in a contract between the customer and the clearing broker. In that case, the court held that the fact that the agreement between the customer (the plaintiff) and the clearing broker named the introducing broker (the defendant) as the transactional broker for the customer did not establish an agency relationship between the parties. The facts of the case at bar speak less persuasively in favor of an agency relationship: the client's agreement does not even mention Blair.

The second scenario occurs where the introducing broker is made a third-party beneficiary by either the language of the clearing broker's contract or some other manifestation of the parties' intent to con-

fer such rights. *Nesslage v. York Securities, Inc.*, 823 F.2d 231 (8th Cir.1987); *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985 (S.D.N.Y.1984). By contrast to this case, in both *Nesslage* and *Cauble* the clearing firm was actively and noticeably involved in the operation of the customer's account. The defendants rely most heavily on *Cauble* to support their position.

Finding that the introductory broker was a third-party beneficiary to the contract between the clearing broker and the client, the *Cauble* court noted the manner the clearing broker was involved in the client's account and the communication to the client of the three-way relationship in a letter delineating the basic terms of that arrangement. 594 F.Supp. at 990–992. Neither of these factors is present in the case at bar. A more appropriate standard to apply in this case was stated in *Antinoph v. Laverell, Reynolds Securities, Inc.*, [Current Binder] Fed.Sec.L.Rep. (CCH), ¶ 94,765, 1989 WL 67332 (E.D.Pa. June 19, 1989), where the court refused to find the existence of a third-party beneficiary relationship when the client-clearing house contract failed to confer such a right on the introductory broker.

In situations similar to the one in this case, several courts have refused to allow introductory brokers to enforce an arbitration clause under either an agency or third-party beneficiary theory. *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden*, 795 F.2d 1111 (1st Cir.1986); *Billue v. Hyer, Bikson & Hinsen, Inc.*, No. 88–2331–5, 1989 WL 21280 (D.Kan. February 15, 1989) (LEXIS, Genfed library, Dist file); *Lester v. Basner*, 676 F.Supp. 481 (S.D.N.Y.1987); *Ahn v. Rooney, Pace, Inc.*, 624 F.Supp. 368, 370 (S.D.N.Y.1985). *Mowbray* provides the most useful and similar example. In that case, the introductory broker was not a party to the contract between the

---

**3.** The defendants refer the court to a letter allegedly circulated to all clients upon opening their accounts in which the relationship between Blair (as introducing broker) and Prudential–Bache (as clearing broker) is disclosed. (Rubin Aff., Exh. 1). The defendants have not demonstrated that Mr. Wilson received a copy of this correspondence; Mr. Wilson states that no com-

munication of this kind was ever received. Moreover, while Mr. Wilson admits that he became aware of the existence of Prudential–Bache when presented with the client's agreement, there is no evidence demonstrating additional awareness of any agency relationship between that firm and Blair.

clearing house and the customer, nor was it evident to the customer that any agency relationship existed between the clearing house and the introductory broker with whom he dealt solely. The court wrote, "it does not follow from the introductory broker's *de facto* control over a client's account that the client originally or subsequently intended the introducing broker be able to invoke [the clearing house's] power to compel arbitration." 795 F.2d at 1117.

For all of the foregoing reasons, the court now GRANTS the plaintiff's motion to vacate and VACATES the order issued in this case on December 9, 1988 staying this cause pending arbitration. The court further ORDERS that the parties file status reports discussing the appropriate scheduling for the completion of discovery, amendments to the original pleadings, and briefing of any dispositive motions in this matter within fifteen (15) days of the date of this order.

SO ORDERED.